UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COLONIAL PIPELINE COMPANY )<br>)<br>*Plaintiff* )<br>)<br>v. )<br>) No. _____<br>METROPOLITAN NASHVILLE )<br>AIRPORT AUTHORITY; and )<br>AECOM TECHNICAL SERVICES, INC. )<br>)<br>*Defendants* ) | |

## COMPLAINT

Colonial Pipeline Company, for its Complaint against Metropolitan Nashville Airport Authority and AECOM Technical Services, Inc., states:

## PARTIES AND JURISDICTION

1. Plaintiff Colonial Pipeline Company ("Colonial") is a Delaware and Virginia corporation authorized to conduct business in Tennessee, with its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009.

2. Defendant Metropolitan Nashville Airport Authority (also known as The Metropolitan Nashville Airport Authority) ("MNAA") is a Tennessee nonprofit corporation, with its principal place of business at 1 Terminal Drive, Nashville, Tennessee 37214.

3. Defendant AECOM Technical Services, Inc. ("AECOM") is a California corporation authorized to conduct business in Tennessee, with its principal place of business at 300 South Grand Avenue, Floor 9, Los Angeles, California 90071.

4. This Court has personal jurisdiction over MNAA and AECOM because each regularly conducts business in Tennessee and has established sufficient minimum contacts with

this state. In addition, all or a substantial part of the events or omissions giving rise to the claims in this matter occurred in Tennessee.

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b) because this action arises under the laws of the United States, including The Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.* ("OPA"), and under 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is proper under 28 U.S.C. § 1391 and 33 U.S.C. § 2717(b) because the incident under OPA, described below, and a substantial part of the events, acts, and omissions giving rise to the claims involved in this matter occurred in this judicial district.

## GENERAL ALLEGATIONS

7. Colonial owns and operates the largest refined products pipeline in the United States, transporting more than 100 million gallons of petroleum product daily through more than 5,500 miles of pipeline, originating in Houston, Texas and terminating at the Port of New York and New Jersey, with sections of the pipeline extending into Tennessee.[1]

8. In 1976, Colonial entered into a Dedication of Easement and Agreement (the "Easement Agreement") with MNAA, by which MNAA granted Colonial a permanent easement across MNAA's property at Nashville International Airport ("BNA"). A copy of the Easement Agreement is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

9. The Easement Agreement includes Colonial's rights to "construct, operate, maintain, repair, replace and inspect its liquid petroleum products pipeline" within the easement. (Easement Agreement, p. 3.)

---

[1] Two sections of Colonial's pipeline, Line 19 and Line 20, traverse MNAA property.

10. Under the Easement Agreement, MNAA also agreed to "prevent the use of the easement and real property which would interfere with or adversely affect the operation of maintenance of [BNA] or otherwise constitute an airport hazard." (Easement Agreement, p. 8, ¶ 9.)

11. In 2012, while conducting an in-line inspection of Line 19, its 12-inch gasoline delivery line at BNA located within the easement, Colonial discovered several anomalies in the line.

12. A partial excavation of that portion of Line 19, which was located approximately 3.5 feet underneath a gravel road, revealed dents in the line consistent with the teeth of a backhoe.

13. Further investigation, including a review of MNAA construction records, revealed the damage likely occurred in or around 2006 or 2007, when MNAA hired a private contractor to install fiber optic cables and construct a building and gravel road in the vicinity of Line 19.

14. Following this discovery, in 2012, Colonial met with MNAA to express concerns about pipeline safety during excavations and other subsurface activities, and presented a PowerPoint to MNAA entitled "Pipeline Safety Information for Excavators" (the "PowerPoint"). A copy of the PowerPoint is attached hereto as Exhibit B.

15. In the PowerPoint, Colonial included safety guidelines and requirements for digging near pipelines as well as information about the recently discovered pipeline strike, including what was found, what could happen as a result of a strike, and how a strike could be prevented.

16. The PowerPoint included information about contacting the One-Call Center (also known as "811") before digging, and included as a part of "Safe Digging Requirements" to

"[a]rrange for a Colonial representative to be on site before digging near a Colonial pipeline." (PowerPoint, p. 9–11.)

17. The PowerPoint also included a map of Colonial's Line 19 gasoline pipeline overlaid on a satellite image of BNA property, including the locations of the strike discovered by Colonial in 2012 and the later strike in 2019. (PowerPoint, p. 6.)

18. In mid-December 2018, two employees of Colonial, Christopher White and Donald Strickland, responded to multiple One-Call tickets at BNA initiated by the Tennessee Department of Transportation ("TDOT") and others.

19. That response included locating and marking both of Colonial's lines (Lines 19 and 20) with a combination of pin flags and paint.

20. A portion of Line 19 runs in the vicinity of the north end of Runway 20L at BNA, which was and is an active runway surrounded by a security fence. The fence and warning signs prohibit access to the secured area, as do FAA regulations. *See e.g.*, 14 C.F.R. §§ 139.309, .329 & .335.

21. Because they were not able to access the area inside the fence, Messrs. White and Strickland marked Line 19 up to the fence, but not inside it.

22. Based on information and belief, all of these One-Call tickets were initiated in connection with TDOT's planning for the relocation, reconfiguration, and widening of the Interstate 40 interchange with Donelson Pike near BNA, and possibly other projects.

23. On or about December 12, 2018, Mr. White had a discussion with Russell Shelton at TDOT, during which they discussed the general area of the work to be performed by TDOT and MNAA, and the location of Colonial's pipelines.

4

24. In a follow-up conversation on or about December 17, 2018, Mr. White called Mr. Shelton and told him Colonial had marked the location of its pipelines, including Line 19 up to the security fence surrounding Runway 20L, but did not have access to and did not mark inside the secured area.

25. In that call, Mr. White also told Mr. Shelton that Colonial needed to be present if TDOT was going to perform work near Colonial's pipelines, and requested a phone call when TDOT was ready to work near the lines or in the secured area.

26. Colonial never received any such call from TDOT or MNAA, or from AECOM, which was working for MNAA in connection with the project.

27. After this time, from January to early April 2019, in response to later re-authorizations of TDOT's One-Call tickets, Messrs. White and Strickland periodically drove around the vicinity to confirm the lines were still marked and there were no indications of work being performed near the lines, including after receiving TDOT's last One-Call ticket on March 28, 2019.

28. The re-authorization tickets included no further details about the work to be performed, and Colonial responded to the tickets as marked.

29. In addition to the markings made by made by Messrs. White and Strickland in response to the One-Call tickets, there are permanent "lollipop" markers (so named for their shape) in the vicinity of the pipeline that include warnings of a pipeline in the area and a notice to call Colonial before excavating.

30. On the morning of April 9, 2019, Colonial was informed and determined Line 19 had been struck at BNA, and promptly shut down Line 19 in accordance with Colonial's

5

operating procedures.[2] Colonial subsequently reported the incident to the U.S. Coast Guard National Response Center, in accordance with applicable law.

31. When Messrs. White and Strickland arrived at the site, they saw a drill rig inside the security fence and gasoline coming out of the ground at that location within Colonial's easement.

32. Messrs. White and Strickland also saw the permanent Colonial pipeline marker just outside the fence, which contains a warning of a pipeline and to call Colonial before excavating, which was visible from the location where there was drilling.

33. Messrs. White and Strickland also saw one or more pin flags lying in the area outside the fence. Based on information and belief, these were flags they had placed when marking Line 19 in December 2018, and which had, until recently, still been planted in the ground and visible.

34. Based on information and belief, TDOT employees were doing soil borings at one or more locations inside the BNA security fence in connection with TDOT's planning for the relocation, reconfiguration, and widening of the Interstate 40 interchange with Donelson Pike near BNA, when they struck Line 19 on April 9, 2019.

35. Based on information and belief, at the time of the strike, MNAA's contractor, AECOM, was involved in observing, facilitating, and/or directing TDOT's work, and advised TDOT it was safe to drill in the location where the strike occurred.

36. Based on information and belief, both AECOM, including Cody Mitchell (who was the AECOM engineer at the drill site), and MNAA knew or should have known they were in the near vicinity of Line 19 and should have initiated another One-Call ticket and contacted

---

[2] Colonial and MNAA are parties to a Tolling Agreement, and this Complaint is filed within the tolling period.

Colonial before proceeding, especially in light of the fact there were no markings in the secured area where the drilling was to take place.

37. Based on information and belief, at the time of the strike, MNAA and AECOM were using information they knew or should have known was not accurate with respect to the location of Line 19.

38. After Messrs. White and Strickland arrived at the site, Ken Whatley, an employee of MNAA, expressed surprise and/or frustration that "[his] engineer" had not called Colonial about the work to be taking place.

39. Based on information and belief, the engineer to whom Mr. Whatley was referring was AECOM's Mr. Mitchell.

40. As a result of the line strike, a substantial amount of gasoline was released.

41. Based on information and belief, some of the gasoline has reached, and all or a substantial portion of the gasoline has threatened, McCrory Creek at a point a few miles upstream from its confluence with Stones River.

42. McCrory Creek is a tributary to the Stones River, and both waterways are "navigable waters," within the meaning of OPA (33 U.S.C. § 2701(21)) and 40 C.F.R. § 120.2.

43. Gasoline is considered "oil," as defined in 33 U.S.C. § 2701 (23).

44. Pursuant to the federal Clean Water Act ("CWA"), the Environmental Protection Agency ("EPA") determined the incident resulted in a discharge and substantial threat of a discharge of oil into the navigable waters of the United States, pursuant to 33 U.S.C. § 1321(c); and EPA designated Colonial, as owner and operator of the pipeline without regard to fault, as the source of oil and advised Colonial of its potential liabilities and obligation to undertake an immediate removal action in accordance with applicable law.

45. In response to the gasoline release incident, Colonial undertook a removal action, consistent with the National Contingency Plan, 40 C.F.R. Part 300, under the supervision and direction of the EPA Federal On Scene Coordinator. This removal action is ongoing.

46. Colonial has incurred, and likely will continue to incur, millions of dollars of costs and damages as a result of the strike of Line 19 and the resulting release of gasoline, including but not limited to costs and damages related to repair of the pipeline, lost product containment, removal and remediation of the gasoline release, and other costs and damages.

47. Pursuant to Rule 8 of the Federal Rules of Civil Procedure, the following counts include alternative allegations, claims, and requests for relief.

## COUNT I
## BREACH OF CONTRACT BY MNAA

48. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

49. The Easement Agreement between Colonial and MNAA is a valid and enforceable contract.

50. Colonial has performed all of its obligations under the Easement Agreement.

51. MNAA breached the Easement Agreement by, among other things, the acts and omissions alleged above, which were inconsistent and interfered with Colonial's enjoyment and use of the easement.

52. As a result of MNAA's breaches, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE BY MNAA AND AECOM

53. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

54. MNAA and AECOM owed Colonial, and the public in general, duties which include those of reasonable care and competence in performing, authorizing, observing, facilitating, and/or directing work in or near Colonial's easement and pipeline.

55. MNAA and AECOM knew or should have known they were in the vicinity (even near vicinity) of Colonial's easement and pipeline, and that performing, authorizing, observing, facilitating, and/or directing drilling in the area of Colonial's pipeline without contacting Colonial or taking other appropriate action could result in a strike of the pipeline.

56. MNAA and AECOM breached their duties in ways that included the acts and omissions alleged above.

57. MNAA's and AECOM's acts and omissions directly and proximately resulted in the strike of Line 19 and the release of gasoline to the environment.

58. As a result of MNAA's and AECOM's negligence, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial.

## COUNT III
## TRESPASS BY AECOM

59. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

60. By engaging in the acts and omissions alleged above, AECOM intentionally and physically entered or interfered with Colonial's property without consent or legal right, constituting a trespass, and/or caused or allowed others to so trespass.

61. The trespass deprived Colonial of the use and enjoyment of its property and resulted in damage.

62. As a result, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial.

## COUNT IV
## WRONGFUL INTERFERENCE WITH EASEMENT BY AECOM

63. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

64. The Easement Agreement gives rise to a valid easement held by Colonial.

65. By engaging in the acts and omissions alleged above, AECOM wrongfully and/or unreasonably interfered with Colonial's legitimate use and enjoyment of its easement, resulting in damage.

66. As a result, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial.

## COUNT V
## OPA - CONTRIBUTION CLAIM AGAINST MNAA AND AECOM PURSUANT TO 33 U.S.C. § 2709 AND THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 *et seq.*

67. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

68. Under OPA, "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under [OPA] or another law." 33 U.S.C. § 2709.

69. Under OPA, "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 2701(27).

70. Under OPA, "removal costs" include "all removal costs incurred by the United States . . . [or] a State . . . under subsection (c), (d), (e), or (l) of [the federal Clean Water Act] section 1321" and "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." 33 U.S.C. § 2702(b)(1). In responding to the OPA incident, Colonial has incurred, and continues to incur, significant removal costs and damages under OPA.

10

71. The acts and omissions of third parties, including AECOM and MNAA, solely caused or contributed to the discharge and substantial threat of a discharge of oil into navigable waters, and therefore AECOM and MNAA are liable for the removal costs and damages, pursuant to OPA, including but not limited to 33 U.S.C. § 2709, 33 U.S.C. 2702, and under all theories set forth in Counts I–V.

72. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA, 33 U.S.C. § 2717(f)(2), Colonial is entitled to a declaratory judgment that defendants AECOM and MNAA are liable as responsible parties under OPA for the removal costs and damages.

## COUNT VI
## DECLARATORY JUDGMENT AGAINST MNAA AND AECOM

73. Colonial realleges and incorporates paragraphs 1 through 47 of the Complaint.

74. An actual controversy exists between Colonial and MNAA and AECOM regarding the matters set forth in this Complaint, and within the jurisdiction of this Court.

75. As such, Colonial is entitled to a declaration under 28 U.S.C. § 2201 that defendants MNAA and AECOM are liable under theories set forth in Counts I–V and that Colonial is entitled to the relief sought herein.

## RELIEF REQUESTED

Colonial asks the Court to:

1. Enter a judgment declaring that MNAA and AECOM are liable for the removal costs and damages under OPA;

2. Enter a judgment declaring that MNAA and AECOM are liable under theories set forth in Counts I–V and that Colonial is entitled to the relief sought herein;

3. Enter judgment against MNAA and AECOM for damages in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, including the damages alleged above and other costs and damages Colonial has incurred or incurs;

4. Award Colonial pre- and post-judgment interest;

5. Award Colonial its costs incurred in this action; and

6. Grant Colonial additional relief to which it is entitled.

Respectfully submitted,

/s  *Brian M. Dobbs*
L. Wearen Hughes (BPR No. 5683)
J. Andrew Goddard (BPR No. 6299)
Brian M. Dobbs (BPR No. 25855)
Bass, Berry & Sims PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
(615) 742-6200
whughes@bassberry.com
dgoddard@bassberry.com
bdobbs@bassberry.com

*Attorneys for Plaintiff Colonial Pipeline Company*