# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| COLONIAL PIPELINE COMPANY | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | Case No. 3:20-cv-00666 |
| v. | ) | |
| | ) | Judge William L. Campbell, Jr. |
| METROPOLITAN NASHVILLE | ) | Magistrate Judge Alistair E. Newbern |
| AIRPORT AUTHORITY; and | ) | JURY DEMAND |
| AECOM TECHNICAL SERVICES, INC. | ) | |
| | ) | |
| *Defendants* | ) | |

## AMENDED COMPLAINT

Colonial Pipeline Company, for its Amended Complaint against Metropolitan Nashville Airport Authority and AECOM Technical Services, Inc., states:

### PARTIES AND JURISDICTION

1.     Plaintiff Colonial Pipeline Company ("Colonial") is a Delaware and Virginia corporation authorized to conduct business in Tennessee, with its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009.

2.     Defendant Metropolitan Nashville Airport Authority (also known as The Metropolitan Nashville Airport Authority) ("MNAA") is a Tennessee nonprofit corporation, with its principal place of business at 1 Terminal Drive, Nashville, Tennessee 37214.

3.     Defendant AECOM Technical Services, Inc. ("AECOM") is a California corporation authorized to conduct business in Tennessee, with its principal place of business at 300 South Grand Avenue, Floor 9, Los Angeles, California 90071.

4.     This Court has personal jurisdiction over MNAA and AECOM because each regularly conducts business in Tennessee and has established sufficient minimum contacts with

this state. In addition, all or a substantial part of the events or omissions giving rise to the claims in this matter occurred in Tennessee.

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b) because this action arises under the laws of the United States, including The Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.* ("OPA"), and under 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is proper under 28 U.S.C. § 1391 and 33 U.S.C. § 2717(b) because the incident under OPA, described below, and a substantial part of the events, acts, and omissions giving rise to the claims involved in this matter, occurred in this judicial district.

GENERAL ALLEGATIONS

7. Colonial owns and operates the largest refined products pipeline system in the United States, transporting more than 100 million gallons of petroleum product daily through more than 5,500 miles of pipeline, originating in Houston, Texas and terminating at the Port of New York and New Jersey, with sections of the pipeline extending into Tennessee.[1]

8. In 1976, Colonial entered into a Dedication of Easement and Agreement (the "Easement Agreement") with MNAA, by which, among other things, MNAA granted Colonial a permanent easement across MNAA's property at Nashville International Airport ("BNA"). A copy of the Easement Agreement is attached hereto as Exhibit A and incorporated herein by reference.

---

[1] Two sections of Colonial's pipeline, Line 19 and Line 20, traverse MNAA property.

2

9.      The Easement Agreement includes Colonial's rights to "construct, operate, maintain, repair, replace and inspect its liquid petroleum products pipeline" that is within the easement. (Easement Agreement, p. 3.)

10.     Under the Easement Agreement, MNAA also agreed to "prevent the use of the easement and real property which would interfere with or adversely affect the operation or maintenance of [BNA] or otherwise constitute an airport hazard." (Easement Agreement, p. 8, ¶ 9.)

11.     In 2012, while conducting an in-line inspection of Line 19, its 12-inch gasoline delivery line at BNA located within the easement, Colonial discovered several anomalies in the line.

12.     A partial excavation of that portion of Line 19, which was located approximately 3.5 feet underneath a gravel road, revealed dents in the line consistent with the teeth of a backhoe. These dents were in a section of Line 19 located less than 150 yards from the section of pipeline involved in the 2019 line strike discussed below.

13.     Further investigation by Colonial in 2012, including a review of MNAA construction records, revealed the damage occurred from a line strike in or around 2006 or 2007 by a private contractor MNAA hired to install fiber optic cables and construct a building and gravel road in the vicinity of Line 19. MNAA did not inform Colonial of this line strike.

14.     Based on information provided to or reviewed by Colonial, in connection with that line strike, MNAA learned the location of Line 19 on its maps was inaccurate, but did not correct it.

15.     Following Colonial's discovery of that line strike, Colonial met with MNAA in 2012 to express concerns about pipeline safety during excavations and other subsurface activities

3

at BNA, and presented a PowerPoint to MNAA entitled "Pipeline Safety Information for Excavators" (the "PowerPoint"). A copy of the PowerPoint is attached hereto as <u>Exhibit B</u>.

16.     In the PowerPoint, Colonial included safety guidelines and requirements for digging near pipelines as well as information about the recently discovered pipeline strike, including what was found, what could happen as a result of a strike, and how a strike could be prevented.

17.     The PowerPoint included information about contacting the One-Call Center (also known as "811") before digging, and included as a part of "Safe Digging Requirements" to "[a]rrange for a Colonial representative to be on site before digging near a Colonial pipeline." (PowerPoint, p. 9–11.)

18.     The PowerPoint also included a general map of Colonial's Line 19 gasoline pipeline overlaid on a satellite image of BNA property. The portion of Line 19 depicted on this map included the locations of the strike discovered by Colonial in 2012 and the later strike in 2019 (PowerPoint, p. 6.).  While not intended to substitute for other methods of determining the location of pipelines, this map put MNAA on further notice its maps were inaccurate.

19.     In mid-December 2018, two employees of Colonial, Christopher White and Donald Strickland, responded to multiple One-Call tickets at BNA initiated by the Tennessee Department of Transportation ("TDOT") and others.

20.     That response included locating and marking, with a combination of pin flags and paint, those portions of both of Colonial's lines (Lines 19 and 20) they could access.

21.     A portion of Line 19 runs in the vicinity of the north end of Runway 20L at BNA, which was and is an active runway surrounded by a security fence. The fence and warning signs

prohibit access to the secured area, as do FAA regulations. *See e.g.*, 14 C.F.R. §§ 139.309, .329 & .335.

22.     Because they were not able to access the area inside the fence, Messrs. White and Strickland marked Line 19 up to the fence, but not inside it.

23.     Based on information provided to or reviewed by Colonial, some or all of these One-Call tickets were initiated in connection with TDOT's planning for the relocation, reconfiguration, and widening of the Interstate 40 interchange with Donelson Pike near BNA, and possibly other projects, in connection with MNAA's potential airport expansion projects.

24.     On or about December 12, 2018, Mr. White had a discussion with Russell Shelton at TDOT, during which they discussed the general area of the work to be performed by TDOT and MNAA, and the location of Colonial's pipelines.

25.     In a follow-up conversation on or about December 17, 2018, Mr. White called Mr. Shelton and told him Colonial had marked the location of its pipelines, including Line 19 up to the security fence surrounding Runway 20L, but did not have access to and did not mark inside the secured area.

26.     In that call, Mr. White also told Mr. Shelton that Colonial needed to be present if TDOT was going to perform work near Colonial's pipelines, and requested a phone call when TDOT was ready to work near the lines or in the secured area.

27.     Colonial never received any such call from TDOT or MNAA, or from AECOM, which was MNAA's engineering firm in connection with the project.

28.     After this time, from January to early April 2019, in response to later re-authorizations of TDOT's One-Call tickets, Messrs. White and Strickland periodically drove around the vicinity to confirm the lines were still marked and there were no indications of work

5

being performed near the lines, including after receiving TDOT's last One-Call ticket on March 28, 2019.

29.     The re-authorization tickets included no further details about the work to be performed, and Colonial responded to the tickets that Colonial had marked its facilities.

30.     In addition to the markings made by made by Messrs. White and Strickland in response to the One-Call tickets, there are permanent pipeline markers in the vicinity of the pipeline that include warnings of a pipeline in the area and a notice to call Colonial before excavating.

31.     On the morning of April 9, 2019, Colonial was informed and determined Line 19 had been struck at BNA, and promptly shut down operation of Line 19 in accordance with Colonial's operating procedures.[2]  Colonial subsequently reported the incident to the U.S. Coast Guard National Response Center, in accordance with applicable law.

32.     When Messrs. White and Strickland arrived at the site, they saw a drill rig inside the BNA security fence and gasoline coming out of the ground at that location within Colonial's easement. This line strike was less than 150 yards from MNAA's earlier strike on Line 19 referred to above.

33.     Messrs. White and Strickland also saw the permanent Colonial pipeline marker just outside the fence, containing a warning of the presence of a pipeline and to call Colonial before excavating, which was visible from the location where there was drilling.

34.     Messrs. White and Strickland also saw one or more pin flags lying in the area outside the fence. Messrs. White and Strickland understood these to be the flags they had placed

---

[2] Colonial and MNAA are parties to a Tolling Agreement, and the original Complaint in this action was filed within the tolling period.

6

when marking Line 19 in December 2018, and which had, until recently, still been planted in the ground and visible.

35. Based on information provided to or reviewed by Colonial, TDOT employees were doing soil borings at one or more locations inside the BNA security fence in connection with TDOT's planning for the relocation, reconfiguration, and widening of the Interstate 40 interchange with Donelson Pike near BNA, and possibly other projects, in connection with MNAA's potential airport expansion projects, when they struck Line 19 on April 9, 2019.

36. MNAA gave TDOT permission to conduct the soil borings, and MNAA, directly and/or through its retained engineer, AECOM, was involved in the soil borings.

37. Based on information provided to or reviewed by Colonial, TDOT's engineer had requested that an MNAA representative be in the field with the TDOT team as TDOT laid out the proposed boring locations to confirm they were are reading the GIS map correctly and there were no known utilities in the area.

38. Based on information provided to or reviewed by Colonial, at the time of the strike, AECOM was involved in observing, facilitating, and/or directing TDOT's work, and provided guidance or information to TDOT indicating it was safe to drill in the location of the line strike.

39. Based on information provided to or reviewed by Colonial, MNAA provided TDOT, TDOT's engineering firm, and/or AECOM incorrect information regarding the location of the easement and pipeline which, along with AECOM's failure to confirm its accuracy, resulted in the line being struck.

40. Based on information provided to or reviewed by Colonial, both AECOM, including Cody Mitchell (who was the AECOM engineer at the drill site during at least some of

7

the drilling activity), and MNAA knew or should have known they were in the near vicinity of Line 19 and should have initiated another One-Call ticket and contacted Colonial before proceeding, especially in light of the fact there were no indications the pipeline had been marked inside the secured area where the drilling was to take place.

41.     Based on information provided to or reviewed by Colonial, at the time of the strike, MNAA and AECOM were using information they knew or should have known was not accurate with respect to the location of Line 19, including mapping information for Line 19 that had not been corrected after MNAA learned from the prior line strike that its mapping information for Line 19 was inaccurate.

42.     After Messrs. White and Strickland arrived at the site, Ken Whatley, an employee of MNAA, expressed surprise and/or frustration that "[his] engineer" had not called Colonial about the work to be taking place.

43.     The engineer to whom Mr. Whatley was referring was AECOM's Mr. Mitchell.

44.     As a result of the line strike, over 14,000 gallons of gasoline were released into surrounding soils.

45.     The strike required Colonial to shut down operation of Line 19 for some two days during the incident response. The response continued thereafter and included, among other things, air quality monitoring, construction of berms and trenches to attempt to control the spread of gasoline in the surrounding soils, deployment of sorbent booms to attempt to control the spread of gasoline in nearby McCrory Creek, deployment of an encapsulating agent for fire suppression during the response and repairs to the pipeline, removal of some contaminated soils, and installing several recovery wells to begin recovering contaminated groundwater. Several of these actions are continuing.

8

46.     The strike and resulting release of gasoline adversely affected Colonial's operation of the pipeline, as well as airport operations. It also created a hazard to persons, property, the environment, Colonial's operations and airport operations. As discussed further in this Amended Complaint, it has caused and continues to cause substantial and continuing adverse impacts to Colonial, including costs and damages from the strike and other impacts in connection with the contamination.

47.     Approximately 200 people were involved in some of the response to the incident, including approximately 65 Colonial employees, airport emergency and fire responders, Nashville Fire Department, Metro Nashville Police Department, as well as officials from the Transportation Safety Administration, Environmental Protection Agency ("EPA"), Tennessee Department of Environment and Conservation, TDOT, and Tennessee Emergency Management Agency.

48.     The ultimate duration and total amount of the impacts, costs and damages, including the impacts on the cost of the potential relocation and replacement of the pipeline, currently are ongoing and undetermined as of yet.

49.     Some of the gasoline has reached and/or threatened McCrory Creek at a point a few miles upstream from its confluence with Stones River.

50.     McCrory Creek is a tributary to the Stones River, and both waterways are "navigable waters," within the meaning of OPA (33 U.S.C. § 2701(21)) and 40 C.F.R. § 120.2.

51.     Gasoline is considered "oil," as defined in 33 U.S.C. § 2701 (23).

52.     Pursuant to the federal Clean Water Act, the EPA determined the incident resulted in a discharge and substantial threat of a discharge of oil into the navigable waters of the United States, pursuant to 33 U.S.C. § 1321(c); and EPA identified Colonial, as owner and operator of

9

the pipeline, without regard to fault, as the source of oil and advised Colonial of its potential liabilities and obligation to undertake an immediate removal action in accordance with applicable law.

53.     In response to the gasoline release incident, Colonial undertook a removal action, consistent with the National Contingency Plan, 40 C.F.R. Part 300, under the supervision and direction of the EPA Federal On-Scene Coordinator. This removal action is ongoing.

54.     Colonial has incurred, and (depending on the outcome of this case and further directives of governmental agencies) likely will continue to incur, significant costs and damages as a result of the strike of Line 19 and the resulting release of gasoline, including costs and damages related to repair of the pipeline, lost product containment, removal and remediation of the gasoline release, and other costs and damages.

55.     Leading up to the line strike, Colonial had been involved in discussions with MNAA, and in discussions with TDOT, about possibly relocating Colonial's pipelines to accommodate MNAA's and TDOT's potential projects. At least one of the options Colonial has been considering involves abandoning portions of its pipelines in place and replacing those portions in different locations outside of the easement. The line strike has complicated these efforts.

56.     In addition to impacting Colonial's operation of its pipeline, the line strike created a hazardous condition at the airport, and has impacted Colonial's potential plans to relocate and replace portions of its pipelines, including as to potential timing, location, and cost of relocation and replacement.

57.     Pursuant to Rule 8 of the Federal Rules of Civil Procedure, the following counts include alternative allegations, claims, and requests for relief.

COUNT I
BREACH OF CONTRACT BY MNAA

58.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

59.     The Easement Agreement between Colonial and MNAA is a valid and enforceable contract.

60.     The Easement Agreement contains an implied duty of good faith and fair dealing in its performance and enforcement.

61.     Colonial has performed all of its express and implied obligations under the Easement Agreement.

62.     MNAA breached the Easement Agreement by, among other things, the acts and omissions discussed in this Amended Complaint.  These acts and omissions were in breach of and interfered with Colonial's reasonable expectations and rights under the Easement Agreement, and were contrary to the express and implied terms of the Easement Agreement.

63.     Those expectations and rights included Colonial's enjoyment and use of its pipelines as contemplated under the Easement Agreement and the expectation MNAA would not take or allow any action that would adversely affect Colonial's pipeline or rights or benefits under the Easement Agreement.

64.     MNAA's breaches included its:

    a.  Causing a shutdown and disruptions to, and otherwise adversely affecting, Colonial's operation and maintenance of its pipeline;

    b.  Causing a situation that adversely affected airport operations;

    c.  Creating a hazard to persons, property, the environment, Colonial's operations and airport operations;

11

d.  Causing contamination that has required and continues to require Colonial to devote a substantial amount of its operation, personnel and other resources to the response and the removal action; and

e.  Causing contamination that affects Colonial's potential plans to relocate and replace portions of its pipelines, including as to potential timing, location, and cost of relocation and replacement.

65.  MNAA's acts and omissions constitute deficiencies in performance by MNAA and breaches of the express terms of the Easement Agreement.

66.  MNAA's acts and omissions also impaired Colonial's reasonable expectations under, and its rights to receive the benefits of, the Easement Agreement, thereby constituting breaches of the covenant of good faith and fair dealing implied in the Easement Agreement.

67.  MNAA has taken no steps to cure or otherwise remedy its breaches.

68.  As a result of MNAA's breaches, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial and other relief allowed by law.

## COUNT II
## NEGLIGENCE BY MNAA AND AECOM

69.  Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

70.  MNAA and AECOM owed Colonial, and the public in general, duties which include those of reasonable care and competence in performing, authorizing, observing, facilitating, and/or directing work in or near Colonial's easement and pipeline.

71.  MNAA and AECOM knew or should have known they were in the vicinity (even near vicinity) of Colonial's easement and pipeline, and that performing, authorizing, observing,

12

facilitating, and/or directing drilling in the area of Colonial's pipeline, without contacting Colonial or taking other appropriate action, could result in a strike of the pipeline.

72.     MNAA and AECOM breached their duties in ways that included the acts and omissions alleged in this Amended Complaint.

73.     MNAA's and AECOM's acts and omissions directly and proximately resulted in the strike of Line 19 and the release of gasoline to the environment.

74.     As a result of MNAA's and AECOM's negligence, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial and other relief allowed by law.

COUNT III
TRESPASS BY AECOM

75.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

76.     By engaging in the acts and omissions alleged above, AECOM intentionally and physically entered or interfered with Colonial's property without consent or legal right, constituting a trespass, and/or caused or allowed others to so trespass.

77.     The trespass deprived Colonial of the use and enjoyment of its property and resulted in damage.

78.     As a result, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial and other relief allowed by law.

COUNT IV
WRONGFUL INTERFERENCE WITH EASEMENT BY AECOM

79.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

80.     The Easement Agreement gives rise to a valid easement held by Colonial.

81.     By engaging in the acts and omissions alleged above, AECOM wrongfully and/or unreasonably interfered with Colonial's legitimate use and enjoyment of its easement, resulting in damage.

82.     As a result, Colonial has been and likely will continue to be damaged, and is entitled to monetary relief in an amount to be proven at trial and other relief allowed by law.

COUNT V
IMPLIED INDEMNITY AGAINST MNAA AND AECOM

83.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

84.     Colonial has incurred, and (depending on the outcome of this case and further directives of governmental agencies) likely will continue to incur, significant costs and damages as a result of the strike of Line 19 and the resulting release of gasoline, including costs and damages Colonial is responsible or potentially responsible to pay to others because of MNAA and AECOM.

85.     As set forth above, these costs and damages were the result of MNAA's and AECOM's acts and omissions, including MNAA's breaches and deficient performance under the Easement Agreement and AECOM's wrongful and tortious conduct.

86.     As the parties responsible for Colonial's costs and damages, MNAA and AECOM should bear them, and the burden of paying Colonial's costs and damages should be shifted to MNAA and AECOM to prevent an unjust result.

87.     MNAA and AECOM should indemnify Colonial against costs and damages it has incurred or incurs as a result of MNAA's and AECOM's acts and omissions, and pay such costs and damages on Colonial's behalf.

14

## COUNT VI
### OPA - THIRD PARTY CLAIM AGAINST MNAA AND AECOM
### UNDER 33 U.S.C. § 2702(d) AND 33 U.S.C. § 2703, AND THE DECLARATORY
### JUDGMENT ACT, 28 U.S.C. §§ 2201 et seq.

88.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

89.     As described in Paragraph 52 above, pursuant to the federal Clean Water Act, the EPA determined the incident resulted in a discharge and substantial threat of a discharge of oil into the navigable waters of the United States, pursuant to 33 U.S.C. § 1321(c); and EPA identifed Colonial, as owner and operator of the pipeline without regard to fault, as the source of oil and advised Colonial of its potential liabilities and obligation to undertake an immediate removal action in accordance with applicable law. 33 U.S.C. § 2701(32(F)); 33 U.S.C. § 1321(c)(5).

90.     Under OPA, "removal costs" include "all removal costs incurred by the United States . . . [or] a State . . . under subsection (c), (d), (e), or (l) of [the federal Clean Water Act] section 1321" and "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." 33 U.S.C. § 2702(b)(1). In responding to the OPA incident, Colonial has incurred, and continues to incur, significant removal costs and damages under OPA.

91.     Colonial reported the incident as required by law, and coordinated its removal activities in cooperation with, and at the direction of, the EPA Federal On-Scene Coordinator, in satisfaction of 33 U.S.C. § 2703(c).

92.     Colonial is entitled to a defense under 33 U.S.C. § 2703(a)(3), because the discharge and substantial threat of a discharge of oil into navigable waters of the United States was caused solely by the acts and omissions of third parties, such as AECOM and MNAA.

15

93.     At all relevant times, Colonial exercised due care with respect to the pipeline, and took precautions against foreseeable acts or omissions of third parties such as AECOM and MNAA, and the foreseeable consequences of those acts or omissions.

94.     Under OPA, if a responsible party "establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties," then "the third party or parties shall be treated as the responsible party for purposes of determining liability under [OPA]." 33 U.S.C. § 2702(d)(1)(A). See also 33 U.S.C. § 2703(a)(3).

95.     The acts and omissions of third parties such as AECOM and MNAA solely caused the discharge and substantial threat of a discharge of oil to navigable waters, and such acts and omissions did not occur in connection with any contractual relationship with Colonial, and therefore AECOM and MNAA are jointly and severally liable as responsible parties under OPA for the removal costs and damages, pursuant to 33 U.S.C. § 2702(d)(1)(A) and 33 U.S.C. § 2703(a)(3), including subrogated claims under 33 U.S.C. § 2715.

96.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA, 33 U.S.C. § 2717(f)(2), Colonial is entitled to a declaratory judgment that defendants AECOM and MNAA are liable as responsible parties under OPA for the removal costs and damages.

COUNT VII
OPA - CONTRIBUTION CLAIM AGAINST MNAA AND AECOM
PURSUANT TO 33 U.S.C. § 2709 AND THE DECLARATORY JUDGMENT ACT,
28 U.S.C. §§ 2201 *et seq.*

97.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

98.     Under OPA, "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under [OPA] or another law." 33 U.S.C. § 2709.

16

99.     Under OPA, "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 2701(27).

100.     Under OPA, "removal costs" include "all removal costs incurred by the United States . . . [or] a State . . . under subsection (c), (d), (e), or (l) of [the federal Clean Water Act] section 1321" and "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." 33 U.S.C. § 2702(b)(1). In responding to the OPA incident, Colonial has incurred, and continues to incur, significant removal costs and damages under OPA.

101.     The acts and omissions of third parties, including AECOM and MNAA, solely caused or contributed to the discharge and substantial threat of a discharge of oil into navigable waters, and therefore AECOM and MNAA are liable for the removal costs and damages, pursuant to OPA, including but not limited to 33 U.S.C. § 2709, 33 U.S.C. 2702, and under all theories set forth in Counts I–VI.

102.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and OPA, 33 U.S.C. § 2717(f)(2), Colonial is entitled to a declaratory judgment that defendants AECOM and MNAA are liable as responsible parties under OPA for the removal costs and damages.

COUNT VIII
DECLARATORY JUDGMENT AGAINST MNAA AND AECOM

103.     Colonial realleges and incorporates paragraphs 1 through 57 of this Amended Complaint.

104.     An actual controversy exists between Colonial and MNAA and AECOM regarding the matters set forth in this Amended Complaint, and within the jurisdiction of this Court.

17

105.     As such, Colonial is entitled to a declaration under 28 U.S.C. § 2201 that defendants MNAA and AECOM are liable under theories set forth in Counts I–VII and Colonial is entitled to the relief sought herein.

## RELIEF REQUESTED

Colonial asks the Court to:

1.     Enter a judgment declaring MNAA and AECOM are liable for the removal costs and damages under OPA, including future costs and damages;

2.     Enter a judgment declaring MNAA and AECOM are liable under theories set forth in Counts I–VII and Colonial is entitled to the relief sought herein;

3.     Enter judgment against MNAA and AECOM for damages in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, including the damages alleged above and other costs and damages Colonial has incurred or incurs;

4.     Award Colonial pre- and post-judgment interest;

5.     Award Colonial its costs incurred in this action; and

6.     Grant Colonial additional relief to which it is entitled.

Respectfully submitted,

s/    *Brian M. Dobbs*
L. Wearen Hughes (BPR No. 5683)
J. Andrew Goddard (BPR No. 6299)
Brian M. Dobbs (BPR No. 25855)
Bass, Berry & Sims PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
(615) 742-6200
whughes@bassberry.com
dgoddard@bassberry.com
bdobbs@bassberry.com

*Attorneys for Plaintiff Colonial Pipeline Company*

18

## CERTIFICATE OF SERVICE

I certify that I filed this document electronically using the Court's electronic case management system, which will send notice to:

Paul S. Davidson
Edward Callaway
Michael C. Brett
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
paul.davidson@wallerlaw.com
ed.callaway@wallerlaw.com
mike.brett@wallerlaw.com

*Attorneys for Defendant and Counter-Claimant*
*Metropolitan Nashville Airport Authority*

Gary C. Shockley
Caldwell G. Collins
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
211 Commerce Street
Nashville, TN 37201
gshockley@bakerdonelson.com
cacollins@bakerdonelson.com

*Attorneys for Defendant AECOM Technical Services, Inc.*

s/   *Brian M. Dobbs*
Brian M. Dobbs

19