**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **COLONIAL PIPELINE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-CV-00666** |
| | ) | |
| **METROPOLITAN NASHVILLE** | ) | **Judge William L. Campbell, Jr.** |
| **AIRPORT AUTHORITY; and AECOM** | ) | **Magistrate Judge Alistair E. Newbern** |
| **TECHNICAL SERVICES, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**DEFENDANT METROPOLITAN NASHVILLE AIRPORT AUTHORITY'S**
**ANSWER TO AMENDED COMPLAINT**

Defendant Metropolitan Nashville Airport Authority (the "Airport"), answers Plaintiff

Colonial Pipeline Company's ("Plaintiff" or "Colonial") Amended Complaint as follows:

**PARTIES AND JURISDICTION**

1.      Upon information and belief, the Airport admits the allegations in paragraph 1.

2.      The Airport admits the allegations in paragraph 2, except states that it is a public

and governmental body under the Tennessee Governmental Tort Liability Act  ("GTLA"), acting

as an agency and instrumentality of the Metropolitan Government of Nashville and Davidson

County, Tennessee.

3.      Upon information and belief, the Airport admits the allegations in paragraph 3.

4.      Paragraph 4 contains a description of this action and conclusions of law as to

which no response is required.  The Airport admits this Court has personal jurisdiction over the

defendants.

5.     Paragraph 5 contains a description of this action and conclusions of law as to which no response is required.  The Airport denies the remaining allegations in paragraph 5, except admits that this Court has diversity jurisdiction.

6.     Paragraph 6 contains a description of this action and conclusions of law as to which no response is required.  The Airport denies the remaining allegations in paragraph 6, except admits that venue is proper in this District.

## GENERAL ALLEGATIONS

7.     Upon information and belief, the Airport admits the allegations in paragraph 7 and in footnote 1.

8.     The Airport admits the allegations in paragraph 8 that it entered into the Easement Agreement.  Paragraph 8 contains a description of the terms of the Easement Agreement and conclusions of law as to which no response is required.  The Airport refers to the referenced Easement Agreement for its contents.

9.     Paragraph 9 contains a description of the terms of the Easement Agreement and conclusions of law as to which no response is required.  The Airport refers to the referenced Easement Agreement for its contents.

10.     Paragraph 10 contains a description of the terms of the Easement Agreement and conclusions of law as to which no response is required. The Airport refers to the referenced Easement Agreement for its contents.

11.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.

12.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12.

13.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.

14.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.

15.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15.

16.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.

17.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17.

18.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, except denies that Colonial put the Airport on notice that its maps were inaccurate.

19.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19, except admits Colonial responded to multiple One-Call Tickets initiated by TDOT. The Airport refers to the referenced responses and related email notifications from Colonial to TDOT for their content.

20.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, except admits Colonial notified TDOT that the lines had been marked and denies that Colonial's notifications indicated it could not access any relevant portion of the lines or that any portion of the lines had not been located and marked.

21.     The Airport admits the allegations in the first sentence of paragraph 21. The Airport denies the allegations contained in the second sentence of paragraph 21 as stated, except

admits that there is an area secured by a fence and that Colonial knew how to gain access to the secured area to operate, maintain, repair, replace and inspect its pipelines and to mark its lines in response to TDOT's One Call tickets. The Airport refers to the referenced FAA regulations for their contents.

22. The Airport denies the allegation in paragraph 22 that Colonial was not able to gain access to the secured area. The Airport denies knowledge or information sufficient to form a belief as to the truth of the remaining allegation in paragraph 22, except admits, upon information and belief, that Colonial did not mark Line 19 inside the secured area.

23. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 and refers to the referenced One-Call tickets for their content.

24. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24.

25. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25, except admits, upon information and belief, that Colonial did not mark the lines inside the secured area and denies Colonial could not gain access inside the secured area.

26. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27, except admits that in response to TDOT's One-Call tickets, Colonial did not inform the Airport that Colonial needed to be present when TDOT was performing work near Colonial's pipelines; did not request access to the secured area to mark its

lines; and did not request notification from the Airport as to when TDOT planned to commence work in the secured area. The Airport admits it did not call Colonial to advise Colonial that TDOT was scheduled to work in the secured area the morning of April 9, 2019.

28. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29. Paragraph 29 contains a description of "re-authorization tickets" and Colonial's response to those tickets as to which no response is required, except the Airport admits that Colonial's responses did not advise TDOT that the lines inside the secured area had not been marked or that Colonial requested further notification from TDOT when TDOT was ready to work in the vicinity of the lines or in the secured area.

30. The Airport denies Colonial placed markings or permanent markers in the area where TDOT conducted its soil test boring on April 9, 2019 and refers to the alleged permanent markers for their content and location.

31. The Airport denies information or knowledge sufficient to form a belief as to the allegations in paragraph 31, except admits Colonial was informed that Line 19 had been struck and that it was able to promptly shut down operation of the line. The Airport admits the allegation in footnote 2 that it and Colonial were parties to a tolling agreement, but refers to that agreement for its content.

32. The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32, except admits that Line 19 was punctured by TDOT inside the security fence.

33.    The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and refers to the alleged permanent marker for its location and content.

34.    The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34.

35.    The Airport admits that TDOT employees were doing soil borings inside the security fence when they struck Line 19 on April 9, 2019 and refers to TDOT for the purpose of those borings.

36.    The Airport admits it gave TDOT permission to conduct the soil test borings on April 9, 2019, but denies it was involved in the soil borings.

37.    The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37, except denies that TDOT relied upon the Airport to determine if there were utilities in the area of the soil borings.

38.    The Airport denies the allegations in paragraph 38, except admits that in the early morning of the day the strike occurred AECOM's employee escorted TDOT's employees into the secured area.

39.    The Airport denies the allegations in paragraph 39.

40.    The Airport denies the allegations in paragraph 40.

41.    The Airport denies the allegations in paragraph 41.

42.    The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42.

43.    The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43.

44.     The Airport admits the allegation in paragraph 44 that gasoline was released as a result of the strike, except denies knowledge or information sufficient to form a belief as to the amount released.

45.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45.

46.     The Airport admits the strike temporarily impacted Colonial's operation of the pipeline.  The Airport denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46.

47.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 as stated, except admits that a number of people were involved in responding to the strike.

48.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.

49.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 as stated, except admits that some gasoline threatened McCrory Creek.

50.     Paragraph 50 contains a conclusion of law as to which no response is required. The Airport refers to the referenced OPA and regulation for its contents.

51.     Paragraph 51 contains a conclusion of law as to which no response is required. The Airport refers to the referenced OPA for its contents.

52.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52. The Airport refers to the referenced communications from the EPA for their content.

53.     The Airport admits Colonial undertook remedial efforts but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53.

54.     The Airport admits that both Colonial and the Airport have incurred costs as a result of the pipeline strike.  The Airport denies it is responsible to pay Colonial's costs.  The Airport further denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 54.

55.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55, except admits that Colonial had been involved in discussions with the Airport and TDOT about relocating Colonial's pipelines to accommodate the Airport's expansion project. The Airport denies the line strike has complicated relocation efforts.

56.     The Airport admits that the line strike temporarily impacted Colonial's operation of the pipeline, but denies the remaining allegations in paragraph 56.

57.     Paragraph 57 contains a description of the Complaint and conclusions of law to which no response is required.

## COUNT I

58.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

59.     The Airport admits the allegation in paragraph 59.

60.     Paragraph 60 contains a legal conclusion as to which no response is required.

61.     The Airport denies the allegations in paragraph 61.

62.     The Airport denies the allegations in paragraph 62 and denies that Plaintiff has stated a claim for breach of contract.

63.     Paragraph 63 contains a legal conclusion as to which no response is required.  To the extent a response is required, the Airport denies it breached the Easement Agreement.

64.     The Airport denies the allegations in paragraph 64.

65.     The Airport denies the allegations in paragraph 65.

66.     The Airport denies the allegations in paragraph 66 and denies that Plaintiff has stated a claim for breach of contract.

67.     The Airport denies the allegations in paragraph 67.

68.     The Airport denies the allegations in paragraph 68.

## COUNT II

69.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

70.     Paragraph 70 contains conclusions of law as to which no response is required. The Airport denies it is liable for breach of any duty owed to Colonial.

71.     The Airport denies the allegations in paragraph 71.

72.     The Airport denies the allegations in paragraph 72.

73.     The Airport denies the allegations in paragraph 73.

74.     The Airport denies the allegation in paragraph 74.

## COUNT III

75.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

76.     Paragraph 76 contains allegations only against AECOM to which no response from the Airport is required.

77.      Paragraph 77 contains allegations only against AECOM to which no response from the Airport is required.

78.     Paragraph 78 contains allegations only against AECOM to which no response from the Airport is required.

## COUNT IV

79.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

80.     Paragraph 80 contains allegations only against AECOM to which no response from the Airport is required.

81.     Paragraph 81 contains allegations only against AECOM to which no response from the Airport is required.

82.     Paragraph 82 contains allegations only against AECOM to which no response from the Airport is required.

## COUNT V

83.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

84.     The Airport admits that both Colonial and the Airport have incurred costs as a result of the pipeline strike.  The Airport denies it is responsible to pay Colonial's  costs.  The Airport further denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 84.

85.     The Airport denies the allegations in paragraph 85.

86.     The Airport denies the allegations in paragraph 86.

87.     The Airport denies the allegations in paragraph 87.

## COUNT VI

88.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

89.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89. The Airport refers to the referenced communications from the EPA for their content.

90.     Paragraph 90 contains conclusions of law as to which no response is required. The Airport denies it is liable for Colonial's removal costs or any other damages.

91.     The Airport denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91.

92.     The Airport denies the allegations in paragraph 92.

93.     The Airport denies the allegations in paragraph 93.

94.     Paragraph 94 contains a conclusion of law as to which no response is required. The Airport refers to the referenced statutes for their contents.

95.     The Airport denies the allegations in paragraph 95.

96.     The Airport denies the allegations in paragraph 96 and denies any liability to Colonial.

## COUNT VII

97.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

98.     Paragraph 98 contains conclusions of law as to which no response is required. The Airport refers to the referenced OPA for its contents.

99.     Paragraph 99 contains conclusions of law as to which no response is required. The Airport refers to the referenced OPA for its contents.

100.    Paragraph 100 contains conclusions of law as to which no response is required. The Airport refers to the referenced OPA, Clean Water Act and National Contingency Plan for their contents.  The Airport denies it is liable for Colonial's removal costs or any other damages.

101.     The Airport denies the allegations in paragraph 101.

102.     The Airport denies the allegations in paragraph 102.

## COUNT VIII

103.     The Airport realleges and incorporates the preceding paragraphs of its Answer.

104.     The Airport admits the allegation in paragraph 104, except denies any liability to Plaintiff.

105.     The Airport denies the allegation in paragraph 105.

## DEFENSES

Without assuming the burden of proof on any matters where that burden rests on Plaintiff, the Airport asserts the following affirmative and other defenses with respect to the claims asserted in the Amended Complaint.

## FIRST DEFENSE

Count I of the Amended Complaint fails to state a claim against the Airport upon which relief can be granted.

## SECOND DEFENSE

This Court lacks jurisdiction over Count VI, the OPA Third Party Claim Against the Airport and AECOM Under 33 U.S.C. § 2702(d) and 33 U.S.C. § 2703, and Count VII, the OPA Contribution Claim Against the Airport and AECOM Pursuant to 33 U.S.C. § 2709, because McCrory Creek is not a "navigable water" within the meaning of OPA 33 U.S.C. § 2701(21).

## THIRD DEFENSE

Plaintiff is not entitled to contribution from the Airport under the OPA because the Airport is not liable or potentially liable under the OPA or any other law.

## FOURTH DEFENSE

Plaintiff is not entitled to recover its costs from the Airport under the OPA pursuant to 33 U.S.C. § 2702 because those costs were not caused solely by the acts or omission of a third party under the terms of 33 U.S.C. § 2703(a)(3).

## FIFTH DEFENSE

Plaintiff is not entitled to recover its costs from the Airport under the OPA or otherwise because it failed to exercise due care with respect to the oil concerned, and because Plaintiff failed to take precautions against foreseeable acts or omissions of third parties and the consequences of those acts or omissions.

## SIXTH DEFENSE

Plaintiff is not entitled to recover its costs under the OPA because they are not "removal costs," in that they were not incurred consistent with the National Contingency Plan, as required by the OPA.

## SEVENTH DEFENSE

Any costs or alleged damages incurred by Plaintiff are not the result of any act or omission of the Airport, and are the proximate result, either in whole or part, of the actions or omissions of other persons or entities or other intervening and independent causes.

## EIGHTH DEFENSE

To the extent the Airport is determined to have any responsibility for costs or damages incurred as a result of the pipeline strike, it is entitled to an apportionment of such costs and damages in relation to the degree of fault of all parties, persons or entities, including Plaintiff and TDOT, and hereby notices its intent to reflect the inclusion on the verdict form of all persons or

entities shown during discovery or investigation to have been at fault, in whole or in part, for the damages alleged to have been suffered by Plaintiff.

## NINTH DEFENSE

Plaintiff had actual or constructive knowledge of, and in the exercise of reasonable care should have known, that TDOT was drilling in the secured area and Plaintiff's acts and omissions caused or contributed to its own costs and alleged damages.

## TENTH DEFENSE

The Airport asserts any and all defenses, immunities and/or limitations set forth in the Tennessee Governmental Tort Liability Act, codified in Tennessee Code Annotated § 29-20-201, et seq.

## ELEVENTH DEFENSE

Pending further investigation and discovery, the Airport reserves the right to raise any additional defenses, counter claims, cross claims, and third party claims not asserted in this answer of which it may become aware through discovery or other investigation, as may be appropriate at a later time.

## TWELFTH  DEFENSE

All allegations in the Amended Complaint not heretofore specifically admitted or denied are hereby denied.

## JURY TRIAL DEMAND

**Pursuant to Federal Rule of Civil Procedure 38(b), the Airport demands a trial by jury of all of the claims in the Amended Complaint and in the Airport's Counterclaim so triable.**

# COUNTERCLAIM

The Airport states as follows for its counterclaim:

## PARTIES AND JURISDICTION

1.      Colonial is a Delaware and Virginia corporation authorized to conduct business in Tennessee, with its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009.

2.      The Airport is a public governmental body acting as an agency and instrumentality of the Metropolitan Government of Nashville and Davidson County Tennessee, with its principal place of business at One Terminal Drive Suite 501, Nashville, TN 37214.

3.      This Court has personal jurisdiction over Colonial because it filed this action, regularly conducts business in Tennessee, and has established sufficient minimum contacts with this state. In addition, all or a substantial part of the events or omissions giving rise to the claims in this counterclaim occurred in Tennessee.

4.      This Court has original jurisdiction of this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Colonial and the Airport, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to the claims involved in this counterclaim occurred in this judicial district.

## GENERAL ALLEGATIONS

6.      In 1976, the Airport entered into a Dedication of Easement and Agreement with Colonial (the "Easement Agreement"), by which the Airport granted Colonial a permanent easement across the Airport's property at BNA "to construct, operate, maintain, repair, replace

and inspect its liquid petroleum products pipeline." Two sections of Colonial's pipeline, Line 19 and Line 20, traverse the Airport's property pursuant to the Easement Agreement.

7.      The Easement Agreement provides in relevant part that "Colonial Pipeline agrees to defend and to hold the Metropolitan Nashville Airport Authority free and harmless from loss from each and every claim and demand of whatever nature, made on behalf of or by any person or persons, for any act or omission on the part of Colonial, its agents, servants, employees, suppliers, constructors or tenants. It is the intention that Colonial shall, at all times, and under all circumstances, hold the Metropolitan Nashville Airport Authority free and harmless from any damages or judgment resulting as aforesaid, by reason of any accident or injury to person or property occurring on the premises or improvements thereon[.]"

8.      The Easement Agreement further provides in relevant part that "Colonial agrees to operate in such a way as to fully protect the Airport and its environs from any environmental pollution either through the air or water."

9.      The Easement Agreement further provides in relevant part that "[i]n the event of breach of any of the above covenants, the Metropolitan Nashville Airport Authority shall have the right to re-enter said land and the above described easement shall thereupon revert to and vest in and become the absolute property of the Metropolitan Nashville Airport Authority and its assigns."

10.     Pursuant to the Tennessee Underground Utility Damage Prevention Act, Tenn. Code. Ann. § 65-31-101 *et seq.* (the "One Call Statute"), any party about to engage in any excavation or demolition operation must notify Tennessee 811 of their intent to excavate or demolish, and Tennessee 811 must notify its member utility operators of the proposed area of excavation or demolition.

11.     Upon receipt of such notice from Tennessee 811, utility operators have three (3) working days to locate and mark the surface of the tract or parcel of land to be affected by the excavation or demolition, indicating the approximate location of all underground utilities that may be damaged as a result of the excavation or demolition. High visibility safety yellow must be used to mark gas and oil distribution and transmission facilities. Tenn. Code. Ann. § 65-31-108.

12.     "If an operator fails to locate its facilities within three (3) working days in the manner required by 65-31-108 after receiving proper notification as required by this section and an underground facility of the operator is damaged by an excavator as a result of the operator's failure to discharge such duty, then the excavator shall not be liable for the damage," provided that the excavator uses reasonable care. Tenn. Code. Ann. § 65-31-106(d).

13.     Between December 12, 2018 and March 28, 2019, the Tennessee Department of Transportation ("TDOT") submitted no less than eight (8) One Call Tickets to Tennessee 811 providing notice of their intent to conduct soil test borings at the intersection of Donelson Pike and Hangar Lane in Nashville, Tennessee. True and correct copies of TDOT's One Call Tickets are attached as Exhibit 1.

14.     The description of the area of excavation in each One Call Ticket is identical: "FROM INTER[STATE], GO N[ORTH] APPX 2400FT TO BEGIN MARKING OFF N[ORTH]E[AST] SIDE OF DONELSON PIKE...GO N[ORTH]E[AST] OFF RD 4000FT TO CONTINUE...MARK N[ORTH]E[AST] OFF RD 2000FT, MARKING 300FT WIDE PATH THIS DISTANCE." From the first ticket submitted December 12, 2018, to the last ticket submitted March 28, 2019, TDOT's scope of work never changed.

15.     On January 30, 2019, TDOT received a response from Colonial to One Call Ticket Number 190303602 dated January 30, 2019, stating in relevant part "Colonial Pipeline has facilities near your work site and has marked them." A true and correct copy of Colonial's January 30, 2019 Response is attached as Exhibit 2.

16.     On April 1, 2019, TDOT received a response from Colonial to One Call Ticket Number 190874353 dated March 28, 2019, stating in relevant part "Colonial Pipeline has facilities near your work site and has marked them." A true and correct copy of Colonial's April 1, 2019 Response is attached as Exhibit 3.

17.      Colonial did not, in fact, adequately mark its facilities. As alleged in Colonial's Amended Complaint, a portion of Line 19 runs in the vicinity of the north end of Runway 20L at BNA, which is surrounded by a security fence. Colonial employees Christopher White and Donald Strickland failed to mark Line 19 inside the security fence.

18.     On information and belief, Mr. White and Mr. Strickland failed to adequately re-mark Line 19 in response to re-authorization requests from TDOT. As alleged Colonial's Amended Complaint, Mr. White and Mr. Strickland "periodically drove around the vicinity to confirm the lines were still marked." Mr. White and Mr. Strickland did not actually re-mark the lines.  The lines were not adequately marked on April 9, 2019, the day TDOT conducted its soil test borings and struck Line 19.

19.     Colonial regularly conducts maintenance on Line 19, including those portions of Line 19 inside the security fence.  In 2019, Colonial knew how to gain access to the interior of the security fence, but failed to take any steps to gain access to mark its lines.

20.     In response to TDOT's One Call tickets, Colonial did not warn the Airport of its employees' failure to mark Line 19 inside the security fence. Nor did Colonial warn the Airport that it should call Colonial before TDOT conducted its soil test borings inside the security fence.

21.     On April 9, 2019--while TDOT's One Call Ticket Number 190874353 dated March 28, 2019, was still in effect--TDOT conducted soil test borings in the area of excavation described in the One Call Ticket. TDOT did not observe evidence that Colonial's lines were in the area of TDOT's planned soil test borings. TDOT exercised reasonable care, but as a result of Colonial's failure to mark its facilities, TDOT's drill rig struck Line 19, releasing gasoline.

22.     The Airport has incurred hundreds of thousands of dollars in cleanup costs and other damages as a result of Colonial's failure to adequately mark its facilities.

## COUNT I: NEGLIGENCE

23.     The Airport realleges and incorporates the preceding paragraphs of its Counterclaim.

24.     Colonial owed the Airport, and the public in general, duties which include those of reasonable care and competence in marking its lines when it received notice that TDOT planned to conduct soil test borings within the Airport property in the vicinity of its pipelines. Under the Easement Agreement, Colonial expressly agreed "to operate in such a way as to fully protect the Airport and its environs from any environmental pollution either through the air or water."

25.     Colonial knew or should have known that its failure to access the secured area to mark its lines and its failure to contact or warn the Airport could result in a strike of the pipeline. Colonial's conduct fell below the applicable standard of care, amounting to a breach of

Colonial's duty to the Airport. A reasonably prudent utility operator would have taken steps to gain access to the secured area and adequately marked its facilities within that area.

26.     Colonial breached its duties in ways that included the acts and omissions alleged above.

27.     Colonial's acts or omissions directly and proximately resulted in the strike of Line 19 and the release of gasoline. The pipeline strike would not have occurred but for Colonial's failure to adequately mark Line 19. This failure was a substantial factor in bringing about the harm; the harm could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence; and no rule or policy relieves Colonial from liability.

28.     As a result of Colonial's negligence, the Airport has been and likely will continue to be damaged, and is entitled to monetary damages in an amount to be proven at trial.

## COUNT II: NEGLIGENCE PER SE

29.     The Airport realleges and incorporates the preceding paragraphs of its Counterclaim.

30.     Colonial owed a statutory duty of care to the Airport and to the public. Under the Tennessee Underground Utility Damage Prevention Act, Tenn. Code. Ann. § 65-31-101 *et seq.*, Colonial had a duty to locate and fully mark its utility lines, including inside the secured area, after receiving notice of TDOT's intention to excavate through the Tennessee One Call system.

31.     The Airport belongs to the class of persons the statute is designed to protect, and the Airport's injury is of the type that the statute was designed to prevent.

32.     Colonial violated its statutory duty of care by failing to adequately mark its utility lines, despite being properly notified of TDOT's intention to excavate in the area where the pipeline strike occurred.

33. Colonial violated its statutory duty of care by indicating in its responses to TDOT's One Call notifications that its lines had been marked in the areas where TDOT indicated it planned to conduct soil test borings when the lines had not in fact been marked.

34. Colonial's acts or omissions directly and proximately resulted in the strike of Line 19 and the release of gasoline.

35. As a result of Colonial's negligence per se, the Airport has been and likely will continue to be damaged, and the Airport is entitled to monetary damages in an amount to be proven at trial.

## COUNT III: BREACH OF CONTRACT

36. The Airport realleges and incorporates the preceding paragraphs of its Counterclaim.

37. The Easement Agreement between the Airport and Colonial is a valid and enforceable contract.

38. The Easement Agreement provides in relevant part that "Colonial Pipeline agrees to defend and to hold the Metropolitan Nashville Airport Authority free and harmless from loss from each and every claim and demand of whatever nature . . . for any act or omission on the part of Colonial, its agents, servants, employees, suppliers, constructors or tenants," including "any accident or injury to person or property occurring on the premises or improvements thereon[.]" The Easement Agreement further provides in relevant part that "Colonial agrees to operate in such a way as to fully protect the Airport and its environs from any environmental pollution either through the air or water." Finally, the Easement Agreement further provides in relevant part that "[i]n the event of breach of any of the above covenants, the Metropolitan Nashville Airport Authority shall have the right to re-enter said land and the above described

easement shall thereupon revert to and vest in and become the absolute property of the Metropolitan Nashville Airport Authority and its assigns."

39.     The Airport has performed all of its obligations under the Easement Agreement.

40.     Colonial breached the Easement Agreement by, among other things, the acts and omissions alleged above, including failure to defend and to hold the Airport free and harmless from loss, and failure to operate in such a way as to fully protect the Airport and its environs from any environmental pollution either through the air or water.

41.     The Airport has incurred damages as a result of Colonial's breach of contract, and is entitled to monetary relief in an amount to be proven at trial.

42.     As a result of Colonial's breaches, the Airport is entitled to re-enter the easement held by Colonial, such that it will revert to and vest in and become the absolute property of the Airport.

## COUNT IV: TRESPASS

43.     The Airport realleges and incorporates the preceding paragraphs of its Counterclaim.

44.     The Easement Agreement between the Airport and Colonial is a valid and enforceable contract. Colonial's use of the easement is strictly confined in the Easement Agreement to the following purposes: "to construct, operate, maintain, repair, replace and inspect its liquid petroleum products pipeline."

45.     Colonial has used the easement in a manner inconsistent with the purpose for which it was granted, and has thereby materially increased the burden upon the Airport's property without authorization.

46.     The Airport has incurred damages as a result of Colonial's trespass, and is entitled to monetary relief in an amount to be proven at trial.

47.     As a result of Colonial's trespass, the Airport is entitled to re-enter the easement held by Colonial, such that it will revert to and vest in and become the absolute property of the Airport.

## COUNT V: DECLARATORY JUDGMENT

48.     The Airport realleges and incorporates the preceding paragraphs of its Counterclaim.

49.     An actual controversy exists between the Airport and Colonial regarding the matters set forth in this Counterclaim and within the jurisdiction of this Court.

50.     The Airport is entitled to a declaration under 28 U.S.C. § 2201 that Colonial is liable under theories set forth in Counts I-IV and that the Airport is entitled to the relief sought therein.

## PRAYER FOR RELIEF

Based on the foregoing, the Airport prays that this Court deny any request for judgment on behalf of Colonial, and enter judgment in favor of the Airport against Colonial for an amount to be proven at trial. The Airport also prays for such other and further relief as may be appropriate or that the Court deems just and proper.

Dated: November 9, 2020.

/s/ Paul S. Davidson
Paul S. Davidson (Tenn. BPR No. 011789)
Edward Callaway (Tenn. BPR No. 016016)
Michael C. Brett (Tenn. BPR No. 037290)
WALLER LANSDEN DORTCH & DAVIS LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 850-8942
Facsimile:  (615) 244-6804
paul.davidson@wallerlaw.com
ed.callaway@wallerlaw.com
mike.brett@wallerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

L. Wearen Hughes
J. Andrew Goddard
Brian M. Dobbs
Bass, Berry & Sims PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
(615) 742-6200
whughes@bassberry.com
dgoddard@bassberry.com
bdobbs@bassberry.com

*Attorneys for Plaintiff Colonial Pipeline Company*

Gary C. Shockley
Caldwell G. Collins
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
211 Commerce St., Suite 800
Nashville, TN 37201
(615) 726-5600
gshockley@bakerdonelson.com

*Attorneys for AECOM Technical Services, Inc.*

/s/ Paul S. Davidson