IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COLONIAL PIPELINE COMPANY, | |
| Plaintiff, | Case No. 3:20-cv-00666 |
| v. | |
| METROPOLITAN NASHVILLE AIRPORT AUTHORITY, et al. | Judge William L. Campbell, Jr. Magistrate Judge Alistair E. Newbern JURY DEMAND |
| Defendants | |
| and | |
| METROPOLITAN NASHVILLE AIRPORT AUTHORITY, | |
| Plaintiff/Counter-Defendant, | Case No. 3:20-cv-00809 |
| v. | |
| COLONIAL PIPELINE COMPANY, Defendant/Counter-Claimant. | Judge William L. Campbell, Jr. Magistrate Judge Alistair E. Newbern |

## MEMORANDUM OF LAW IN SUPPORT OF COLONIAL PIPELINE COMPANY'S MOTION TO DISQUALIFY MNAA'S COUNSEL

Colonial Pipeline Company ("Colonial") respectfully submits this Memorandum in Support of its Motion to Disqualify current counsel for Metropolitan Nashville Airport Authority ("MNAA") from further representing MNAA in these lawsuits ("MNAA's Counsel" will refer to the law firm representing MNAA in these lawsuits).

MNAA's Counsel previously represented and advised Colonial adverse to MNAA regarding the same easement agreement and some of the same or similar matters or issues involved in these lawsuits. It may be preliminarily concluded MNAA Counsel has confidential

1

information from that prior representation which is imputed to all attorneys in MNAA's Counsel.[1] Here, MNAA's Counsel actually has confidential information and, moreover, MNAA's lead litigation counsel in these cases has read the file containing at least some of that information. Accordingly, MNAA's Counsel has a conflict of interest and should be disqualified.

## BACKGROUND[2]

Colonial owns and operates a refined products pipeline used to transport millions of gallons of petroleum products across the United States. (Case No. 3:20-cv-00666, Doc. No. 26, Colonial Amended Complaint ¶ 7.) Colonial and MNAA are involved in these two related lawsuits before this Court. (*See generally*, Case No. 3:20-cv-00666, Doc. No. 26, Colonial Amended Complaint; Case No. 3:20-cv-00809, Doc. No. 1-1, MNAA Complaint.) The lawsuits arise from disputes between MNAA and Colonial regarding damage to one of Colonial's pipelines and resulting contamination at Nashville International Airport ("BNA") and the potential relocation of segments of Colonial's pipelines at BNA. (*Id.*)

In 1976, Colonial entered into a Dedication of Easement and Agreement (the "1976 Easement") with MNAA, by which MNAA granted Colonial a permanent easement across a portion of MNAA's property at BNA for the construction and operation of a gasoline pipeline. (Case No. 3:20-cv-00666, Doc. No. 26, Colonial Amended Complaint ¶¶ 8-9.)

In 2018, MNAA began discussions with Colonial about relocating portions of its pipelines to accommodate proposed expansion projects by MNAA and the Tennessee Department of Transportation ("TDOT") involving improvements to roadways in and around

---

[1] Imputation occurs despite the fact that individual lawyers who worked on these matters for Colonial at MNAA's Counsel are no longer with the law firm.

[2] Since the allegations in the lawsuits form the context in which this motion should be addressed, this memorandum contains cites to the relevant allegations.

2

BNA. (Case No. 3:20-cv-00666, Doc. No. 26, Colonial Amended Complaint ¶ 55; Case No. 3:20-cv-00809, Doc. No. 1-1, MNAA Complaint ¶¶ 11-26.)

In April 2019, in connection with MNAA's expansion projects, MNAA gave TDOT employees permission to conduct soil borings at one or more locations at BNA, which resulted in a strike of Colonial's Line 19 and discharge of a significant quantity of gasoline. (*Id.* at ¶ 35-36.) The line strike has contaminated soils and groundwater in the area, causing Colonial to incur millions of dollars in costs and damages, and has impacted pipeline relocation efforts, including as to location, cost, and timing. (*Id.* at ¶¶ 44-56.)

On July 31, 2020, Colonial filed suit in this Court against MNAA and its engineer AECOM Technical Services, Inc. (Case No. 3:20-cv-00666), seeking to hold them responsible for and recover Colonial's costs and damages incurred and to be incurred as a result of the line strike. ("Line Strike Case"). In its Amended Complaint, Colonial asserts, among other things, that MNAA's acts and omissions in relation to the line strike interfered with Colonial's reasonable expectations and rights under the 1976 Easement, were contrary to the express and implied terms of the 1976 Easement, and constituted a breach of the 1976 Easement. (*Id.* at ¶¶ 58-68.)

On September 4, 2020, MNAA filed suit in state court seeking a declaration that Colonial is responsible under the 1976 Easement for relocating its pipelines or easement and asking the court to set a schedule for the relocation ("Relocation Case"). In its Complaint, MNAA seeks an order declaring Colonial responsible for costs and expenses to relocate segments of its pipeline. Colonial removed the case to this Court (Case No. 3:20-cv-00809) and sought to consolidate it with the Line Strike Case. While the Court found "there is some overlap in the claims and relevant evidence," it did not consolidate the cases and said any overlap in

them can be handled through case management. (Case No. 3:20-cv-00666, Doc. No. 46, Order.) Case management of both cases is being coordinated and the parties have agreed generally that discovery in one case can be used in the other case. (Case No. 3:20-cv-00666, Doc. No. 62, Joint Discovery Plan ¶ 7; Case No. 3:20-cv-00809, Doc. No. 37, Joint Discovery Plan ¶ 7.)

Among the issues in the Relocation Case are Colonial's obligations under the 1976 Easement, including Section 3 dealing with obligations with respect to the relocations of easement or pipelines and the cost thereof (*see e.g.*, Case No. 3:20-cv-00809, Doc. No. 1-1, MNAA Complaint ¶¶ 28-31), and as reflected in the parties' Joint Status Reports filed on April 15, 2021 and May 7, 2021, and other pleadings, whether certain segments of Colonial's pipelines on MNAA's property that have been relocated over the years outside of the boundaries of the 1976 Easement are subject to the 1976 Easement (*see*, Case No. 3:20-cv-00666, Doc. No. 63, Joint Status Report ¶ 2; Case No. 3:20-cv-00809, Doc. No. 8, Colonial Counterclaim ¶¶ 9-10, 17; Doc. No. 40, Joint Status Report ¶ 2; and Doc. No. 42, Amended Joint Status Report ¶ 4). Relevant to this issue is the fact that, in or around May 2000, MNAA sent Colonial a proposed Amended and Restated Easement Agreement that sought to subject all segments moved outside the boundaries of the 1976 Easement as of that time to the terms of the 1976 Easement (the "Proposed Amended Easement"). (Case No. 3:20-cv-00809, Doc. No. 42, Amended Joint Status Report ¶ 4.) Colonial did not execute the Proposed Amended Easement. (*Id.*)

During the course of the lawsuits, it was discovered that Colonial's files regarding prior pipeline relocations indicated MNAA's Counsel previously represented Colonial with respect to easement and right-of-way issues, including at BNA and involving MNAA. Included in them was an invoice from MNAA's Counsel dated March 2002 on an "Airport Authority" matter, which included entries for calls with Colonial in-house counsel on airport right of way and

research on airport expansion plans (*See* **Exhibit A**), as well as bills for specific, apparently unrelated matters and for a "General" matter.

Concerned that MNAA's Counsel has confidential, attorney-client information relevant to the lawsuits, in January of this year Colonial requested copies of certain Colonial files in MNAA's Counsel's possession, specifically any files for the "Airport Authority" matter, the "General" matter, and files for any other generally named matter (*e.g.,* "Miscellaneous") (collectively the "Colonial Files").[3]

The Colonial Files received from MNAA's Counsel indicate Colonial sought legal advice from attorneys at MNAA's Counsel from at least 1999 to 2004, including specifically advice on easement and relocation issues, and engaged MNAA's Counsel to provide that advice with respect to matters that included:

- Rights and obligations related to the 1976 Easement, including Section 3;
- An Amended Easement (proposed by MNAA in or around 2000, but never signed), which proposed to apply the terms of the 1976 Easement to segments of Colonial's pipelines on MNAA property that had been relocated since 1976; and
- Past and proposed relocations, including pipeline segments that, as of or during MNAA's Counsel's representation of Colonial, had been or were proposed to be moved outside of the boundaries of the 1976 Easement.

Documents in those Colonial Files include materials created by MNAA's Counsel evidencing the precise similarity of matters and issues involved in these lawsuits and matters and issues upon which MNAA's Counsel previously represented Colonial adverse to MNAA:

- A "Conflict Record Memorandum" prepared by MNAA's Counsel when the Airport Authority matter was opened that lists the client as "Colonial Pipeline Co," and the adverse party as "Airport Authority," and the "Description of Matter" as "relocation of pipeline" (Attached as **Exhibit B**);

---

[3] MNAA's Counsel initially provided only a copy of the "Airport Authority" file, which contained documents on its representation of Colonial concerning the 1976 Easement, including specifically on Section 3. Colonial again requested the General matter file, which was provided.

5

- A firm-wide conflicts check email from a MNAA's Counsel partner at that time opening the Airport Authority matter describing it as "relocation of pipeline on property newly acquired by Airport Authority – **Determine contractual obligations to relocate based on easement agreements between CPC and Airport Authority** for existing property owned by Airport Authority" (Attached as **Exhibit C** (the "Conflicts Check Email") (emphasis added).

- A March 4, 1992, letter from a then Bass, Berry & Sims attorney to Right of Way counsel at Colonial regarding the 1976 Easement, providing advice on Colonial's responsibility for relocations thereunder, and analyzing possible grounds to oppose a relocation required by MNAA;

- A September 11, 2000, memorandum from an in-house lawyer at Colonial regarding potential MNAA requested pipeline relocation, including obligations for the cost of relocation and citing the 1992 letter; and

- An October 19, 2000, email from Colonial in-house counsel discussing obligations of Colonial under the 1976 Easement.

Colonial considers the last three documents to be confidential and privileged.

These documents demonstrate MNAA's Counsel was engaged by Colonial to advise it on the 1976 Easement, which is the same agreement at issue in both these cases, and on pipeline relocations at BNA directly involving MNAA, including with respect to contractual obligations regarding pipeline relocations under the 1976 Easement. MNAA's Counsel now is adverse to Colonial on behalf of MNAA with respect to the 1976 Easement, including seeking interpretation and enforcement by the Court of the 1976 Easement and involving the same or substantially related matters or issues on which it previously represented Colonial. (*See, e.g.,* Case No. 3:20-cv-00809, Doc. No. 1-1, MNAA Complaint ¶ 31 ("Airport seeks the declaratory judgment of this Court **that it is Colonial's obligation** to relocate the Pipeline at its sole cost and expense **pursuant to the express contract terms of the [1976] Easement** . . . .") (emphasis added); *Id.* at ¶ 29 (quoting the 1976 Easement as the basis for the declaratory relief sought). *See also*, Case No. 3:20-cv-00666, Doc. No. 34, MNAA Counterclaim ¶¶ 36-42 (asserting breach of

contract action against Colonial based on alleged breach of express and implied provisions of the 1976 Easement).

On or about February 12, 2021, counsel for Colonial informed MNAA's Counsel that Colonial believed MNAA's Counsel has a conflict in its continued representation of MNAA in the lawsuits. On or about February 19, 2021, MNAA's lead litigation counsel stated to Colonial's counsel by telephone he had read the Colonial Files requested by Colonial that MNAA's Counsel had provided as of then (the "Airport Authority" file). The "Airport Authority" file contains the documents listed above, except for the Conflicts Check Email, which was provided later.[4]

## LEGAL STANDARD

A district court faced with a motion to disqualify "must exercise its judgment with an eye toward 'upholding the highest ethical standards of the profession, protecting the interest of the litigants in being represented by the attorneys of their choosing, protecting the loyalty and confidences [of clients], and the overriding societal interests in the integrity of the judicial process.'" *See McKinney v. McMeans*, 147 F. Supp. 2d 898, 900 (W.D. Tenn. 2001) (quoting *Bartech Indus. v. Int'l Baking Co.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996)). The authority to disqualify attorneys derives from two sources: (1) the local rules of the district court in which they appear, which typically adopt some form of the Rules of Professional Conduct,[5] and (2) standards developed under federal law. *See Bartech Indus., Inc.*, 910 F. Supp. at 392 ("since

---

[4] Colonial's counsel sent a letter to MNAA's Counsel on April 29, 2021, reiterating and confirming Colonial's position on the conflict of interest and requesting that MNAA's Counsel inform Colonial of its intentions. MNAA's Counsel responded by letter of May 7, 2021, indicating it disagreed it should withdraw or be disqualified, but otherwise not addressing the existence or absence of its conflict of interest in any way.

[5] The U.S. District Court for the Middle District of Tennessee, by Local Rule 83.01, has adopted Tennessee's Rules of Professional Conduct.

7

motions to disqualify counsel affect substantive rights of the parties, such motions are decided by applying standards developed under federal law.") (citing *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1383 (10th Cir. 1994)). In a motion to disqualify, "the movant bears 'the burden of proving that opposing counsel should be disqualified.'" *See Tennessee Bank & Tr. v. Lowery*, No. CIV. 3:11-0984, 2012 WL 4849968, at *1 (M.D. Tenn. Oct. 11, 2012) (quoting *McKinney*, 147 F. Supp. 2d at 900). Ultimately, "the decision of whether to disqualify counsel is a matter of discretion." *See Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 WL 1401030, at *8 (M.D. Tenn. Mar. 26, 2015) (noting district courts are given "wide latitude" in making such determinations) (quoting *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008)).

## ARGUMENT

This situation involves a conflict of interest a law firm has where it possesses confidential information arising from a prior representation on the same or substantially related matters that are involved in current litigation adverse to the former client. Based on the nature of the services provided, the Court may conclude that MNAA's Counsel obtained confidential information from Colonial. See Tenn. Sup. Ct. R. 8, RPC 1.9, cmt. 3(e) ("[A] preliminary conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."). Here, MNAA's Counsel has confidential information, and its lead counsel has read at least some of it.

Both the ABA Model Rules of Professional Conduct as well as the Tennessee Rules of Professional Conduct prevent attorneys from disclosing confidential client information. *See* Tenn. Sup. Ct. Rule R. 8, RPC 1.6, cmt. 2 ("A fundamental principle in the client-lawyer relationship is that . . . the lawyer must not reveal information relating to the representation . . .

8

This contributes to the trust that is the hallmark of the client-lawyer relationship."); *see also* ABA Model Rules of Prof'l Conduct R. 1.6. This duty does not end when the relationship terminates. *See* Tenn. Sup. Ct. R. 8, RPC 1.9. "Clients must feel free to share confidences with their lawyers. This will not occur if we permit lawyers to be today's confidants and tomorrow's adversaries." *See Clinard v. Blackwood*, 46 S.W.3d 177, 188 (Tenn. 2001) (quoting *Penn Mut. Life Ins. Co. v. Cleveland Mall Assocs.*, 841 F. Supp. 815, 818 (E.D. Tenn. 1993)) (holding that a serious appearance of impropriety mandated disqualification of the Waller law firm, despite the use of screening procedures, where the attorney who represented the former client switched sides during the pending litigation).

Here, MNAA's Counsel has not complied with its duties to Colonial as a former client under the applicable rules. If the Court does not disqualify it from further participating in these cases, the situation will continue. There are two grounds upon which the Court may disqualify MNAA's Counsel: (1) Tennessee Rules of Professional Conduct 1.9 and 1.10, which prevent an attorney and his firm from representing a former client's adversary in a similar or substantially related matter and (2) the Sixth Circuit's three-part test for disqualification as established in *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882 (6th Cir. 1990). Disqualification is appropriate and necessary because (1) a past attorney-client relationship exists between MNAA's Counsel and Colonial, (2) MNAA's Counsel currently represents Colonial's adversary in a similar and substantially related matter, and (3) MNAA's Counsel has, and its lead litigation counsel has read, Colonial's confidential information, which could be used, even inadvertently, to further MNAA's position and prejudice Colonial in these lawsuits.

## I. The Tennessee Rules of Professional Conduct Prevent MNAA's Counsel from Further Representing MNAA.

Generally, federal courts have "adopted the ethical rules promulgated by the Supreme Court [of the state] in which the federal court sits." *McKinney*, 147 F. Supp. 2d at 900. This Court has adopted Tennessee's Rules of Professional Conduct[6] and looks to these rules for guidance when analyzing motions to disqualify counsel for conflicts of interests with former clients. *See* M.D. Tenn. R. 83.01(c)(6) ("The standard of professional conduct of the members of the bar of this Court shall include the current Tennessee Rules of Professional Conduct"); *see Barker v. Pro. Educators of Tennessee*, No. 3:12-CV-0044, 2012 WL 1900920, at *3 (M.D. Tenn. May 23, 2012) ("In analyzing motions to disqualify counsel for conflicts of interest with former clients, the court will look to Tennessee's Rules of Professional Conduct for guidance."). "The proper mechanism for bringing alleged unethical conduct to the attention of the court is through a motion to disqualify." *See Bartech Indus., Inc.*, 910 F. Supp. at 392.

Tennessee Rule of Professional Conduct 1.9 prohibits attorneys at MNAA's Counsel who formerly represented Colonial with respect to easement and relocation issues from representing MNAA in the Relocation Lawsuit. Although the attorney at MNAA's Counsel primarily responsible for this conflict has departed, the conflict is nevertheless imputed to the current attorneys at MNAA's Counsel. Under Rule 1.10, when a lawyer has terminated association with a firm, the firm is prohibited from representing an entity with interests materially adverse to the former client if: "the matter is the same or substantially related . . . and any lawyer remaining in the firm has information protected by RPCs 1.6 and 1.9(c) that is material to the matter." *See* Tenn. Sup. Ct. R. 8, RPC 1.10(b). Here, MNAA's Counsel has, and lead litigation counsel has

---

[6] Tennessee's Rules of Professional Conduct are set forth by Tennessee Supreme Court Rule 8.

reviewed, files containing Colonial's confidential information. Accordingly, MNAA's Counsel should be disqualified.

### A. MNAA's Counsel Previously Represented Colonial regarding the Same or Substantially Related Matters.

Tennessee Rule of Professional Conduct 1.9(a) prohibits attorneys from representing other entities in matters that are materially adverse and substantially related to the attorneys' representation of former clients. Rule 1.9 governs lawyers' duties to former clients, and provides in pertinent part:

> (a) A lawyer who has formerly represented a client in a matter **shall not thereafter represent another person in the same or a substantially related matter** in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Tenn. Sup. Ct. R. 8, RPC 1.9(a) (emphasis added). Matters are "substantially related" if: (1) they involve the **same transaction or legal dispute or other work** the lawyer performed for the former client, or (2) there is a **substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter**, unless that information has become generally known. *See* Tenn. Sup. Ct. R. 8, RPC 1.9, cmt. 3–3(c) (emphasis added).[7] This rule prohibits MNAA's Counsel from representing MNAA in this matter.

---

[7] The latter scenario, also known as the substantial relationship test, "attempts to avoid requiring actual disclosure of confidential information by focusing upon the general features of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation." *See* Tenn. Sup. Ct. R. 8, RPC 1.9, cmt. 3(e). Therefore, "a former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter." *Id.* Rather, "a preliminary conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." *Id.*

There is no question attorneys previously associated with MNAA's Counsel represented Colonial. Moreover, it is clear they represented Colonial with respect to the same easement agreement and with respect to relocation issues or obligations regarding BNA that are involved now in these lawsuits. This is obvious from the Conflicts Check Email that indicates MNAA's Counsel opened a new matter for Colonial regarding the "relocation of pipeline on property newly acquired by Airport Authority – **Determine contractual obligations to relocate based on easement agreements between CPC and Airport Authority for existing property owned by Airport Authority.**" (emphasis added). The same or substantially related matters on which Colonial sought legal advice and on which MNAA's Counsel was engaged to advise Colonial back in 2001 to 2004 are part of what is now in dispute – squarely in the Relocation Lawsuit with respect to obligations under Sections 3 – only now MNAA's Counsel represents Colonial's adversary.

MNAA's Counsel's representation of MNAA in the Line Strike Case also is substantially related to MNAA's Counsel's former representation of Colonial, since that case also involves the 1976 Easement and asks the Court to interpret and apply its terms. Issues in the Line Strike Case include whether the line strike constitutes a material breach of the 1976 Easement by MNAA (including the covenant of good faith and fair dealing implied therein), MNAA's counterclaim against Colonial in the Line Strike Case for breach of the 1976 Easement, and other effects of the line strike on the parties' obligations under that Agreement. (*See e.g.*, Case No. 3:20-cv-00666, Doc. No. 26, Colonial Amended Complaint ¶¶ 58-68; Doc No. 28, MNAA Counterclaim ¶¶ 36-42.) There is a substantial risk MNAA's Counsel could use, even inadvertently, confidential information it obtained in its prior representation of Colonial to materially advance MNAA's

position or prejudice Colonial's position in the Line Strike Case, especially in light of the coordinated case management and discovery in the two cases.

Finally, MNAA's counsel did not contact Colonial to seek its consent, and Colonial has not given its informed, written consent, that would allow MNAA's Counsel to continue to represent MNAA in these lawsuits under the Rule.[8]  For these reasons, MNAA's Counsel has a conflict of interest and may not represent MNAA here.

> B.  **Rule 1.10 Imputes the Conflict of Interest to the Entire MNAA's Counsel Firm.**

Tennessee Rule of Professional Conduct 1.10 imputes any MNAA's Counsel attorney's conflict of interest to the entire firm.  Rule 1.10(a) states, "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by [Rules] 1.7, 1.9 or 2.2 . . . ."  Tenn. Sup. Ct. R. 8, RPC 1.10(a).  Under this rule, "a firm of lawyers is essentially one lawyer."  *Id.*

Here, Rule 1.9 prohibits any MNAA's Counsel attorney who previously worked on Colonial matters involving the 1976 Easement and involving pipeline relocation from representing MNAA in these cases.  Rule 1.10(a) imputes their conflict of interest to the entire firm.

When an attorney has terminated association with a firm, attorneys in that firm may represent a person with interests materially adverse to the formerly associated attorney's clients, *unless* "(1) the matter is the **same or substantially related** to that in which the formerly associated lawyer represented the client; and (2) **any lawyer remaining in the firm has**

---

[8] Earlier this year, Colonial and MNAA, through counsel, entered into a limited consent or waiver that allowed them to postpone resolution of any conflict of interest issues for a period of time to allow for mediation sessions and related activities to occur.  While efforts to resolve the cases continue, the period covered by the limited consent has ended.

**information protected by RPCs 1.6 and 1.9(c) that is material to the matter**." *See* Tenn. Sup. Ct. R. 8, RPC 1.10(b) (emphases added). As detailed above, MNAA's Counsel's representation of MNAA in the lawsuits implicates both of these principles.

Section 124 of the *Restatement (Third) of the Law Governing Lawyers* takes a pragmatic view of the need for imputation even after the attorney who previously represented the client departs. It provides:

> During the time that a personally prohibited lawyer is associated with another lawyer, law firm, or other organization to which prohibition is imputed under §123, the lawyer could reveal confidential information to any other lawyer within the organization. Accordingly, imputed prohibition of all lawyers in the firm is appropriately required by §123. However, after the personally prohibited lawyer has left the firm, an irrebuttable presumption of continued sharing of client confidences or continued disloyalty induced by the affiliation is no longer justified.
>
> The lawyers remaining in the affiliation may rebut the presumption that confidential information was shared during the period of actual affiliation. They have the burden of persuasion concerning three facts: **(1) that no material confidential client information relevant to the matter was revealed to any lawyer remaining in the firm; (2) that the firm does not now possess or have access to sources of client confidential information, particularly client documents or files; and (3) that the personally prohibited lawyer will not share fees in the matter so as to have an interest in the representation**.

*See* Restatement (Third) of the Law Governing Lawyers § 124, cmt. c(i) (emphasis added).

MNAA's Counsel cannot meet its burden of overcoming the preliminary conclusion the Court may make and establishing that no attorney remaining at the firm has information protected by Rule 1.6 or Rule 1.9(c). Not only does MNAA's Counsel currently "have access to" Colonial's confidential files, MNAA's lead litigation counsel has acknowledged that he *has* "accessed" and reviewed at least some of those confidential files. There is no question imputation should apply to MNAA's Counsel. Thus, Rule 1.10(b) mandates MNAA's Counsel's disqualification.

**II.     The Sixth Circuit's Three-Part Test in the *Dana* Decision Mandates MNAA's Counsel's Disqualification from Further Representing MNAA.**

MNAA's Counsel's ongoing representation of MNAA in the lawsuits meets all three prongs of the test for disqualification in *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990).[9]

Federal district courts also derive their authority to disqualify attorneys from substantive federal law. *See Bartech Indus., Inc.*, 910 F. Supp. at 392. The Sixth Circuit has adopted a three-part test for determining whether disqualification of counsel is appropriate: "(1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification." *See Dana Corp.*, 900 F.2d at 889 (6th Cir. 1990).

That a past attorney-client relationship existed between Colonial and MNAA's Counsel cannot be disputed. A past attorney-client relationship encompasses a firm's relationship with a client when the conflict of interest is imputed to the firm under the applicable Rules of

---

[9] District courts in Tennessee have stated, "[s]ince the promulgation of the [Rules of Professional Conduct], the federal courts in Tennessee no longer apply the *Dana* test in deciding whether a conflict of interest warrants attorney disqualification." *See Harbin Enterprises Gen. P'ship v. Ingram Micro Inc.*, No. 05-2942 MA/V, 2007 WL 9710345, at *5 (W.D. Tenn. Aug. 15, 2007). The Sixth Circuit has contemplated how the *Dana* analysis operates in conjunction with the local rules of professional conduct of the state in which the federal district court sits. *See Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 651 (6th Cir. 2013) ("Our decisions have not made clear how the *Dana* analysis operates in conjunction with this court's rule that attorneys are 'subject to the rules of professional conduct or other equivalent rules of the state where the attorney's principal office is located.'") (quoting 6th Cir. R. 46(b)). In *Bowers*, which applied the Kentucky Rules of Professional Conduct, the court noted that the effect of using the Rules of Professional Conduct "in place of or in conjunction with" the *Dana* analysis "is minimal at best because the relevant Kentucky Rule is essentially the same . . . ." *Id.* Tennessee's rule regarding duties to former clients is substantially similar to Kentucky's rule. *Compare* Tenn. Sup. Ct. R. 8, RPC 1.9(a) with Ky. S. Ct. R. 3.130(1.9)(a). However, the Bowers holding is nevertheless explicitly based on a *Dana* analysis and not stated in terms of the Rules of Professional Conduct. *Bowers*, 733 F.3d at 654.

15

Professional Conduct. *See Bowers v. Ophthalmology Group*, 733 F.3d 647, 650 n.1 (6th Cir. 2013) (citing, *inter alia*, Model Rules of Prof'l Conduct R. 1.9, cmt 4). As established, Rule 1.10 imputes the conflict of interest created by the attorneys at MNAA's Counsel who previously represented Colonial with respect to the 1976 Easement and relocation issues to the entire firm. Thus, the first prong of the *Dana* test is satisfied.

Further, as discussed above, the subject matter of MNAA's Counsel's former relationship with Colonial is substantially related to its present relationship with MNAA. "[T]he representations are substantially related if they involve the same client and the matters or transactions in question are relevantly interconnected or reveal the client's pattern of conduct." *See Bowers*, 733 F.3d at 652 (quoting *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1536 (D. Kan. 1992)); *see also In re Buchanan*, 25 B.R. 162, 168 (Bankr. E.D. Tenn. 1982) ("A motion to disqualify should be sustained if a substantial relationship exists between the matters involved in the former representation of a client and those in a pending suit in which the interest of a second client is adverse to that of the first client. Establishment of such a 'substantial relationship' is ordinarily sufficient to require disqualification.") (internal citations omitted).

Finally, as discussed above, the attorneys with MNAA's Counsel who represented Colonial acquired pertinent confidential information from Colonial through the prior representation regarding the 1976 Easement and regarding the relocation matters. As discussed, that MNAA's Counsel obtained that confidential information from Colonial may be preliminarily concluded based on the nature of the services provided. *See* Tenn. Sup. Ct. R. 8, RPC 1.9, cmt. 3(e) ("[A] preliminary conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."). Moreover, even

16

Case 3:20-cv-00666   Document 71   Filed 05/25/21   Page 16 of 19 PageID #: 581

beyond just a preliminary conclusion in this matter, it is evident MNAA's Counsel actually has confidential information from Colonial, and MNAA's lead litigation counsel has read at least some of it. MNAA's Counsel must be disqualified under the *Dana* test.

## CONCLUSION

This motion is not being filed lightly, and only after due consideration regarding the nature of the prior representation of Colonial by MNAA's Counsel, the nature of the information involved in that representation, and efforts to avoid this motion, including extensive attempts to resolve these lawsuits and previously raising this conflict of interest with MNAA's Counsel. In light of the fact that depositions likely will occur in these cases in the very near future, which creates the greatest potential so far that Colonial would be prejudiced by the conflict of interest that is the subject of this motion, Colonial has no choice but to raise this matter and ask this Court to address this situation. Based on all of the forgoing, Colonial respectfully asks this Court to disqualify MNAA's Counsel from further representing MNAA in these lawsuits.

Respectfully submitted,

*/s/ John S. Golwen*
John S. Golwen (TN Bar No. 014324)
BASS, BERRY & SIMS, PLC
100 Peabody Place
Suite 1300
Memphis, TN 38103
Direct: (901) 543-5903
Facsimile: (901) 543-5999
Email: jgolwen@bassberry.com

and

L. Wearen Hughes (TN BPR No. 5683)
J. Andrew Goddard (TN BPR No. 6299)
Brian M. Dobbs (TN BAR No. 25855)
BASS, BERRY & SIMS, PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
whughes@bassberry.com
dgoddard@bassberry.com
bdobbs@bassberry.com

*Attorneys for Colonial Pipeline Company*

**CERTIFICATE OF SERVICE**

I certify that I filed this document electronically using the Court's electronic case management system, which will send notice to:

Paul S. Davidson
Travis Parham
Edward Callaway
Michael C. Brett
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
paul.davidson@wallerlaw.com
travis.parham@wallerlaw.com
ed.callaway@wallerlaw.com
mike.brett@wallerlaw.com

*Attorneys for Defendant and Counter-Claimant*
*Metropolitan Nashville Airport Authority*

Gary C. Shockley
Caldwell G. Collins
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
211 Commerce Street
Nashville, TN 37201
gshockley@bakerdonelson.com
cacollins@bakerdonelson.com

*Attorneys for Defendant AECOM Technical Services, Inc.*

                                                */s /John S. Golwen*