UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| COLONIAL PIPELINE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>METROPOLITAN NASHVILLE AIRPORT AUTHORITY and AECOM TECHNICAL SERVICES, INC.,<br><br>    Defendants. | Case No. 3:20-cv-00666<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |
| METROPOLITAN NASHVILLE AIRPORT AUTHORITY,<br><br>    Plaintiff,<br><br>v.<br><br>COLONIAL PIPELINE COMPANY<br><br>    Defendant. | Case No. 3:20-cv-00809<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |

## **MEMORANDUM ORDER**

Colonial Pipeline Company and the Metropolitan Nashville Airport Authority (MNAA) are adverse parties in these actions, both of which involve a gas pipeline owned and operated by Colonial that runs through property owned by MNAA and is subject to an easement agreement between the parties. Colonial has moved to disqualify MNAA's counsel in both cases because Colonial previously sought advice from lawyers formerly associated with that counsel's law firm. (R 666, Doc. No. 70; R. 809, Doc. No. 46.) MNAA has responded in opposition (R. 666, Doc.

No. 82; R. 809, Doc. No. 58) and Colonial has filed a reply (R. 666, Doc. No. 88; R. 809, Doc. No. 64).[1] For the reasons that follow, Colonial's motions will be denied.

I.      **Relevant Background**

     A.      **Factual Background of the Relocation and Line Strike Actions**

In 1976, Colonial and MNAA entered into an easement agreement to govern the placement and operation of a gas pipeline on MNAA property (the Easement Agreement). (R. 666, Doc. No. 26; R. 809, Doc. No. 1-1.) The Easement Agreement gives Colonial the right "to construct, operate, maintain, repair, replace and inspect its liquid petroleum products pipeline within [its defined limits]." (R. 666, Doc. No. 26, PageID# 188; R. 809, Doc. No. 1-1, PageID# 22.) It requires MNAA "to prevent the use of the easement and real property which would interfere with or adversely affect the operation or maintenance of the Nashville Metropolitan Airport or otherwise constitute an airport hazard." (R. 666, Doc. No. 26-1, PageID# 193, ¶ 9; R. 809, Doc. No. 1-1, PageID# 27, ¶ 9.) Finally, the Easement Agreement provides that:

> Colonial will relocate its easements, either those existing on property now owned or hereafter acquired by the Metropolitan Nashville Airport Authority, at its sole cost and expense upon notification by the Metropolitan Nashville Airport Authority that its lines interfere with the expansion, development and/or construction undertaken or to be undertaken by the Metropolitan Nashville Airport Authority, its successors, assigns, agents, or employees.

(R. 666, Doc. No. 26-1, PageID# 191, ¶ 3; R. 809, Doc. No. 1-1, PageID# 25, ¶ 3.)

The Easement Agreement is relevant to Colonial and MNAA's positions in these lawsuits in different ways. *Colonial Pipeline Co. v. Metropolitan Nashville Airport Authority and AECOM Technical Services, Inc.*, Case No. 3:20-cv-00666 (the line strike action), addresses a puncture of

---

[1] AECOM Technical Services, Inc., an engineering firm involved in the airport expansion, is also a defendant to Case No. 3:20-cv-00666, but has not taken a position on Colonial's motion to disqualify MNAA's counsel.

2

Case 3:20-cv-00666   Document 96   Filed 07/27/21   Page 2 of 20 PageID #: 794

the pipeline by Tennessee Department of Transportation (TDOT) employees in April 2019 that resulted in more than 14,000 gallons of gasoline being released into surrounding soil. (R. 666, Doc. No. 26.) Colonial claims, in part, that MNAA's failure to take adequate safety measures to protect the pipeline violated the Easement Agreement by interfering with Colonial's right to operate the pipeline and by creating an airport hazard. (*Id.*) MNAA counterclaims that, under the easement's terms, Colonial must defend and hold MNAA harmless for any claims based on Colonial's acts or omissions and must operate the pipeline "in such a way as to fully protect [MNAA] and its environs from any environmental pollution either through the air or water." (R. 666, Doc. No. 34, PageID# 282, ¶ 8.) MNAA also claims that, if Colonial breaches the terms of the Easement Agreement, the subject property reverts to MNAA. (R. 666, Doc. No. 34.)

In the second case, *Metropolitan Nashville Airport Authority v. Colonial Pipeline Co.*, Case No. 3:20-cv-00809 (the relocation action), MNAA seeks a declaratory judgment that, under the easement's terms, Colonial must relocate the pipeline at its own expense and on an expedited schedule to accommodate MNAA's current airport renovation and expansion project. (R. 809, Doc. No. 1-1.) MNAA also claims that Colonial's refusal of MNAA's relocation demand constitutes a breach of contract. (*Id.*) Colonial counterclaims that the wrongful conduct it alleges by MNAA in the line strike suit constitutes a first material breach of the Easement Agreement that excuses Colonial from its own obligations and that some portions of the pipeline are not covered by the Easement Agreement because they have been relocated outside its boundaries. (R. 809, Doc. No. 8.)

### B.     Procedural Background of the Relocation and Line Strike Actions

Colonial, represented by the law firm Bass, Berry & Sims, PLC (Bass), filed the line strike case in this Court on July 31, 2020. (R. 666, Doc. No. 1.) MNAA, represented by the law firm Waller Lansden Dortch & Davis, LLP (Waller), filed the relocation action in Davidson County

Chancery Court on September 4, 2020. (R. 809, Doc. No. 1-1.) Colonial removed it to this Court on September 18, 2020. (R. 809, Doc. No. 1.) Colonial moved to consolidate the actions (R. 666, Doc. No. 30), which MNAA opposed.[2] (R. 666, Doc. Nos. 38, 39.) The Court denied the motion to consolidate, in part because an inefficiencies in the actions proceeding separately could be mitigated through coordinated discovery and case management. (R. 666, Doc. No. 46, PageID# 417.) To date, all parties have engaged in coordinated discovery, including multiple joint case management and discovery dispute conferences.

### C. Background of the Motions to Disqualify Counsel

Colonial states that, "[d]uring the course of the lawsuits, it was discovered that Colonial's files regarding prior pipeline relocations indicated MNAA's Counsel previously represented Colonial with respect to easement and right-of-way issues, including at [the Nashville airport] and involving MNAA." (R. 666, Doc. No. 71, PageID# 569; R. 809, Doc. No. 47, PageID# 352.) Specifically, Colonial discovered an invoice from Waller dated March 13, 2002, that listed three time entries from attorney Mike Mizell totaling 4.9 hours and attributed to an "Airport Authority" matter. Mizell recorded time for the following tasks:

> Telephone call with [Colonial's in-house counsel Skip] Morrison re: situation re: airport right-of-way; follow up research on Airport Authority expansion plan; update to [Waller attorney Leslie Shechter]
>
> . . .
>
> Exchange of voice mails with S. Morrison re: access to Airport Authority expansion plans; researching information re: potential airport expansion plans
>
> . . .
>
> Left voice mail for S. Morrison re: airport expansion plan

---

[2] AECOM also opposed consolidation.

(R. 666, Doc. No. 71-1, PageID# 586; R. 809, Doc. No. 47-1, PageID# 369.)

In January 2021, Bass attorney Drew Goddard informed Waller attorney Paul Davidson that Colonial had discovered the March 13, 2002 invoice and that Colonial believed Waller might have a conflict representing MNAA in these cases. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) Davidson "had no knowledge or awareness of the work Mr. Mizell had performed on the 'Airport Authority' matter in 2002[,]" which "pre-dated [Davidson's] arrival at Waller by three years." (R. 666, Doc. No. 83, PageID# 679, ¶ 9; R. 809, Doc. No. 59, PageID# 462, ¶ 9.) Davidson "immediately informed both Waller's General Counsel (who also serves as the firm's ethics counsel) and [MNAA]" about the potential conflict and began an investigation of Waller's prior work for Colonial. (R. 666, Doc. No. 83, PageID# 679, ¶ 10; R. 809, Doc. No. 59, PageID# 462, ¶ 10.)

Davidson learned that Waller had not provided any services to Colonial after 2004 and that all files related to that representation were in offsite storage. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) Davidson obtained Colonial's files for the Airport Authority matter and for general matters and provided the files to Goddard at his request. (*Id.*) Goddard specifically asked Davidson to review the general matters files and to confirm that "'nothing related to MNAA is included in them[.]'" (R. 666, Doc. No. 83, PageID# 680, ¶ 17; R. 809, Doc. No. 59, PageID# 463, ¶ 17.) On the advice of Waller's General Counsel, Davidson also reviewed the contents of the Airport Authority file before providing that material to Goddard. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.)

Colonial states that Waller's production of the Airport Authority matter and general matters files "indicate[s] Colonial sought legal advice from [Waller] from at least 1999 to 2004, including specifically advice on easement and relocation issues[.]" (R. 666, Doc. No. 71, PageID# 570;

R. 809, Doc. No. 47, PageID# 353.) Colonial cites documents including a conflict check memorandum issued by Shechter on April 11, 2001, that lists Colonial as Waller's client, the "Airport Authority" as the opposing party, and the matter involved as "relocation of pipeline." (R. 666, Doc. No. 71-2, PageID# 589–90; R. 809, Doc. No. 47-2, PageID# 372–73.) A conflict-check email sent by Shechter on March 27, 2001, lists Colonial as an existing client of the firm and provides notice of three new matters, including a matter addressing "relocation of pipeline on property newly acquired by [MNAA, determine] contractual obligations to relocate based on easement agreements between [Colonial] and [MNAA] for existing property owned by [MNAA]." (R. 666, Doc. No. 71-3, PageID# 592; R. 809, Doc. No. 47-3, PageID# 375.)

Davidson describes the contents of the Airport Authority file as a "mishmash" of documents, most having "nothing to do with the Airport or the 1976 Easement Agreement." (R. 666, Doc. No. 83, PageID# 681, ¶ 21; R. 809, Doc. No. 59, PageID# 464, ¶ 21.) MNAA further characterizes Waller's representation of Colonial as *de minimis* and cites a timesheet showing that, in February and March of 2002, Mizell and Shechter billed a total of 7.5 hours and 0.4 hours respectively to Colonial—apparently the only time these lawyers spent on the Airport Authority matter.[3] (R. 666, Doc. No. 83-4; R. 809, Doc. No. 59-4.) MNAA states that Mizell left employment with Waller no later than 2010 and Shechter left Waller in 2003. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) Davidson began his employment with Waller in 2005. (*Id.*)

Colonial and MNAA also submitted three documents obtained from Waller's files for the Court's *in camera* review. Those documents are described by Colonial as: (1) "[a] March 4, 1992,

---

[3] In addition to the March 13, 2002 invoice described above, a February 15, 2002 invoice reflects that Colonial was billed for 0.4 hours of telephone and email communication by Schechter and for 2.60 hours by Mizell for a "[r]eview of easement[ ] agreements re: airport location and relocation issues; follow up with L. Schechter re: same and suggestions for client[.]" (R. 666, Doc. No. 83-5, PageID# 694; R. 809, Doc. No. 59-5, PageID# 477).

letter from a then Bass, Berry [and] Sims attorney to Right of Way counsel at Colonial regarding the 1976 Easement, providing advice on Colonial's responsibility for relocations thereunder, and analyzing possible grounds to oppose a relocation required by MNAA;" (2) "[a] September 11, 2000, memorandum from an in-house lawyer at Colonial regarding potential MNAA requested pipeline relocation, including obligations for the cost of relocation and citing the 1992 letter;" and (3) "[a]n October 19, 2000, email from Colonial in-house counsel discussing obligations of Colonial under the 1976 Easement." (R. 666, Doc. No. 71, PageID# 571; R. 809, Doc. No. 47, PageID# 354.) After a conference with the Magistrate Judge on the disqualification motions, Colonial submitted a fourth document for *in camera* review that it discovered in its own files and that has not been disclosed to MNAA or Davidson. That document is a January 21, 2002 email from Morrison to Shechter seeking advice regarding a proposal by MNAA to consolidate the then-existing easement agreements.[4] Morrison states by affidavit that, in this email, he "provided factual and historical information that was confidential in nature in order to seek advice and counsel from Waller on Colonial's behalf on relocation obligations of Colonial with respect to pipelines across [the Airport.]." (R. 666, Doc. No. 89, PageID# 752; R. 809, Doc. No. 65, PageID# 535.) Morrison further states that he believed that the "January 21, 2002 email and other communications with Waller on this issues were confidential and privileged." (*Id.*)

In February 2021, Goddard informed Davidson that, based upon its review of Waller's Colonial files, it believed that, "absent a conflict waiver, Waller's representation of [MNAA] in the litigation was a violation of Tennessee Rules of Professional Conduct Rule 1.9 pertaining to former clients." (R. 666, Doc. No. 83, PageID# 683, ¶ 29; R. 809, Doc. No. 59, PageID# 466,

---

[4] The Court notes that it appears Schechter's email address is misspelled as "lshechteer@wallerlaw.com" in the email's heading, which may explain why the document did not appear in Waller's files.

¶ 29.) Davidson responded that Waller did not agree that the discovered files evidenced a conflict. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) Goddard then proposed that the parties enter into a limited conflict waiver agreement so that Waller could represent MNAA in an upcoming scheduled mediation. (*Id.*) Davidson agreed, and Colonial and MNAA executed an "Amended and Restated Limited Consent." (R. 666, Doc. No. 83-6, PageID# 698; R. 809, Doc. No. 59-6, PageID# 481.) The agreement states that, before this litigation, "Waller represented Colonial in connection with certain matters, and [Bass] represented MNAA in connection with certain matters."[5] (R. 666, Doc. No. 83-6, PageID# 698, ¶ 2; R. 809, Doc. No. 59-6, PageID# 481, ¶ 2.) The parties agreed to waive any ethical conflict to allow for the current counsel's representation to continue through a scheduled mediation on March 16, 2021, any ongoing settlement discussions, and all "[a]ctivities in the Litigation reasonably deemed necessary and appropriate by either party and their counsel to prosecute or defend the Litigation . . . from the date of the February 22, 2021 Limited Consent . . . through the end of the Mediation or April 1, 2021, whichever occurs first." (R. 666, Doc. No. 83-6, PageID# 698, ¶ 3; R. 809, Doc. No. 59-6, PageID# 481, ¶ 3.) The parties agreed that the Limited Consent did not constitute a full waiver of any conflict or the right to later move for disqualification. (R. 666, Doc. No. 83-6; R. 809, Doc. No. 59-6.)

Davidson states that, after mediation ended unsuccessfully on March 16, 2021, Colonial engaged in several discovery conferences with MNAA and did not mention disqualification again until April 29, 2021. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) On that date, a Bass attorney communicated to Waller's General Counsel that it believed Waller was conflicted from representing MNAA in these cases and that, if Waller did not withdraw, Colonial would instruct

---

[5] MNAA states, and Colonial does not deny, that Bass formerly represented MNAA and that a recent past chair of MNAA's board of directors is a Bass partner. (R. 666, Doc. No. 82; R. 809, Doc. No. 58.)

Bass to move for Waller's disqualification. (*Id.*) Waller responded on May 7, 2021, that it did not believe it was disqualified from representation. (*Id.*) Colonial filed the motions to disqualify Waller from representation on May 25, 2021.[6] (R. 666, Doc. No. 70; R. 809, Doc. No. 46.)

## II. Analysis

Shechter and Mizell, who represented Colonial, ended their associations with Waller in 2003 and 2010, respectively. Waller "ceased performing any services for Colonial as of approximately 2004." (R. 666, Doc. No. 83, PageID# 680, ¶ 12; R. 809, Doc. No. 59, PageID# 463, ¶ 12.) Davidson joined Waller in 2005 and was retained to represent MNAA in this matter in 2019. (R. 666, Doc. No. 83; R. 809, Doc. No. 59.) Thus, no attorney currently associated with Waller has represented Colonial. The question before the Court, therefore, is whether Shechter and Mizell's representation of Colonial can be imputed to current Waller attorneys.

### A. Legal Standard

When faced with a motion to disqualify counsel, a district court "must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988). Because "the ability to deny one's opponent the services of capable counsel[ ] is a potent weapon," *Manning*, 849 F.2d at 224, that can be "'misused as a technique of harassment[,]'" *Moses v. Sterling Com. (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005) (quoting *Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 257 (S.D. Ohio 1991)), "'[m]otions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *In re Valley-Vulcan Mold Co.*, 237 B.R.

---

[6] The parties appeared for case management and discovery dispute conferences with the Magistrate Judge on March 23, 2021; April 1, 2021; and May 10, 2021, and, to the best of the Court's recollection, did not raise the potential conflict.

322, 337 (6th Cir. 1999) (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993)). "[T]he extreme sanction of disqualification should be utilized only when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 623 F. Supp. 2d 863, 875 (W.D. Mich. 2007) (quoting *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002)). The party seeking disqualification has the burden of proving that opposing counsel should be disqualified, *Bartech Indus., Inc. v. Int'l Baking Co., Inc.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996), and the decision of whether to disqualify counsel is within the district court's discretion. *Grain v. Trinity Health*, 431 F. App'x 434, 445 (6th Cir. 2011).

Colonial's motions are governed by the Tennessee Rules of Professional Conduct, which provide the standard for professional conduct of lawyers practicing before this Court, *see Garland v. Ford Motor Co.*, No. 2:12-cv-00121, 2015 WL 1401030, at *5 (M.D. Tenn. Mar. 26, 2015), and the federal common law test articulated by the Sixth Circuit in *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 2010). The *Dana* test directs that disqualification of counsel is appropriate if "(1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification." 900 F.2d at 889. Although the Sixth Circuit's decisions "have not made clear how the *Dana* analysis operates in conjunction with [the Sixth Circuit's] rule that attorneys are 'subject to the rules of professional conduct or other equivalent rules of the state where the attorney's principal office is located[,]" *Bowers v. Ophthalmology Grp.*,

733 F.3d 647, 651 (6th Cir. 2013), the distinction between the federal and state standards makes little difference in these actions. *See id.* (finding "minimal" difference between applying *Dana* analysis or the Kentucky Rules of Professional Conduct).

Tennessee Rule of Professional Conduct 1.9, which governs disqualification of counsel because of a conflict of interest between a current and former client, states, in relevant part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Tenn. Sup. Ct. R. 8, RPC 1.9(a).

Tennessee Rule of Professional Conduct 1.10 addresses whether one attorney's conflict of interest may be imputed to other attorneys in a firm with which the attorney is or was associated. Rule 1.10(b) states:

> (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
>
> > (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
> >
> > (2) any lawyer remaining in the firm has information protected by RPCs 1.6 and 1.9(c) that is material to the matter.

Tenn. Sup. Ct. R. 8, RPC 1.10(b)(1)–(2). "Rule 1.6 broadly prohibits a lawyer from revealing 'information relating to the representation' (confidential information) without the client's consent or exigent circumstance and Rule 1.9(c) prohibits a lawyer from disclosing confidential information regarding the representation of a former client or using information gained during a representation to the former client's disadvantage, absent exigent circumstance or consent from

the former client." *Jordan v. Kohl's Dep't Stores, Inc.*, No. 3:10-CV-0051, 2010 WL 5279917, at *4 (M.D. Tenn. Dec. 17, 2010).

Applying these standards together, Waller will be prohibited from representing MNAA if: (1) the line strike and relocation actions are substantially related to a matter in which Waller attorneys represented Colonial; and (2) any current Waller attorney acquired confidential information from Colonial that is material to these actions.

### B. Shechter and Mizell Represented Colonial in the Airport Authority Matter Before Departing Waller

The Court's first question is whether Colonial has established that it is a former client of Shechter and Mizell. To establish the existence of an attorney-client relationship, "'a party must show that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney.'" *Bartech Indus., Inc.*, 910 F. Supp. at 393 (quoting *Cole v. Ruidoso*, 43 F.3d 1373, 1384 (10th Cir. 1994)). Morrison's affidavit and accompanying email exhibit show that Morrison submitted information to Schechter that he considered confidential "in order to seek advice and counsel from Waller on Colonial's behalf on relocation obligations of Colonial with respect to pipelines across [the airport]." (R. 666, Doc. No. 89, PageID# 752; R. 809, Doc. No. 65, PageID# 535.) Further, Waller's internal conflict check documents list Colonial as a client (R. 666, Doc. Nos. 71-2, 71-3; R. 809, Doc. Nos. 47-2, 47-3), and Waller billed Colonial for services it provided related to the Airport Authority matter (R. 666, Doc. Nos. 71-1, 83-4, 83-5; R. 809, Doc. Nos. 47-1, 59-4, 59-5). *Cf. Bartech Indus., Inc.*, 910 F. Supp. at 393 (finding that plaintiff's failure to pay retainer or other fees supported finding that no attorney-client relationship existed). Finally, although it characterizes the relationship as "de minimis," Waller does not dispute that Colonial was its client.

## C. Shechter and Mizell's Prior Representation of Colonial Does Not Prevent Waller From Representing MNAA in These Actions

Having established that lawyers previously associated with Waller represented Colonial in a matter, the Court must next determine whether the line strike action and relocation actions are "the same or substantially related to" that matter. Tenn. Sup. Ct. R. 8, RPC 1.9(a). The comments to RPC 1.9 define how matters may be "substantially related" for purposes of a conflict analysis. Comment 3 provides that

> [m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or other work the lawyer performed for the former client or if there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter, unless that information has become generally known.

Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3.

The documents recovered from Waller's files show that, in 2001, Colonial sought legal advice from Shechter and Mizell concerning its contractual obligations under the Easement Agreement's relocation clause, including "relocation of [the] pipeline on property newly acquired by [MNAA.]" (R. 666, Doc. No. 71-3, PageID# 592; R. 809, Doc. No. 47-3, PageID# 375.) In the course of that representation, Mizell reviewed the Easement Agreement's terms regarding location and relocation of the pipeline on airport property, researched airport expansion plans, and formulated suggestions for Colonial. (R. 666, Doc. Nos. 71-1, 83-5; R. 809, Doc. Nos. 47-1, 59-5.) In 2002, Morrison sought advice from Shechter regarding MNAA's proposed renegotiation of the Easement Agreement and the implications of a renegotiated agreement for Colonial's obligations under the relocation clause. (R. 666, Doc. No. 89; R. 809, Doc. No. 65.)

Defined most generally, Waller's prior representation of Colonial involved the same legal dispute as the line strike and relocation actions—a disagreement between Colonial and MNAA as to the Easement Agreement's application. But "[a] court should only disqualify an attorney 'when

there is a "reasonable possibility that some specifically identifiable impropriety" actually occurred.'" *Moses*, 122 F. App'x at 183–84 (quoting *Kitchen*, 769 F. Supp. at 257). The most general definition is too broad a brush in this context, and the Court must look more closely to determine if the actions are "*relevantly* interconnected." *Bowers*, 733 F.3d at 652 (quoting *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1536 (D. Kan. 1992)) (emphasis added).

### 1. The Line Strike Action

The events at the heart of the line strike action took place on April 9, 2019, when TDOT employees punctured Colonial's pipeline on MNAA property. (R. 666, Doc. No. 26.) Colonial alleges that MNAA breached the Easement Agreement by creating the conditions that allowed the strike to occur, interrupting Colonial's use and enjoyment of the pipeline as provided for by the Easement Agreement, creating a situation that affected airport operations, and causing a hazard and contamination that has affected Colonial's operations. (*Id.*) Specifically, Colonial alleges that MNAA failed to update its maps after being put on notice by Colonial that the maps inaccurately reflected the pipeline's location and that MNAA failed to notify Colonial that work was going to be performed near the pipeline so that Colonial could take precautionary measures. (*Id.*) The earliest acts alleged to have contributed to the line strike are meetings between Colonial and MNAA in 2012 regarding pipeline safety during excavations.[7]

MNAA counterclaims that Colonial breached the Easement Agreement's term that it "operate in such a way as to fully protect the Airport and its environs from any environmental pollution" by negligently failing to mark the pipeline, causing the line strike to occur. (R. 666, Doc. No. 34, PageID# 285, ¶ 24.) MNAA also claims that Colonial has breached the Easement

---

[7] Colonial also alleges that AECOM interfered with the Easement Agreement by authorizing drilling in the pipeline area without consulting Colonial and trespassed on Colonial's property demarcated by the Easement Agreement.

Agreement's requirements that it hold MNAA harmless for all claims arising out of Colonial's acts or omissions and protect MNAA from all environmental pollution. (R. 666, Doc. No. 34.) MNAA asserts that, because of these alleged breaches, the property subject to the easement must revert to MNAA. (*Id.*) Finally, MNAA claims that Colonial has used the property for purposes outside those allowed by the Easement Agreement. (*Id.*) Again, all of MNAA's counterclaims arise out of events that took place in 2012 or later.

When the line strike action's claims and counterclaims are specified, it becomes difficult to view it as the same legal dispute as the pipeline relocation matter that was the subject of Shechter and Mizell's representation. All of the events underlying the line strike action's claims and counterclaims took place years after Colonial consulted with Shechter and Mizell and could not have been known at that time. Further, Shechter and Mizell's representation appears to have been limited to the application and contemplated renegotiation of the Easement Agreement's relocation clause. Although Colonial claims that the damage caused by the line strike has "complicated" its discussions with MNAA and TDOT about relocating parts of the pipeline, that allegation does not put the relocation clause at issue in the line strike case. Thus, the line strike action is substantially related to Shechter and Mizell's representation only "if there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance [MNAA's] position . . . unless that information has become generally known." Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3.

Rule 1.9 does not require a former client to reveal what confidential information it disclosed to its counsel to establish a substantial risk that information could be used in a later action. Rather, "the court must look to the general type of information that the potentially conflicted lawyer would have been exposed to in a normal or typical representation of the type that

15
Case 3:20-cv-00666   Document 96   Filed 07/27/21   Page 15 of 20 PageID #: 807

occurred with the now-adverse client." *Bowers*, 733 F.3d at 652; Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3e (court may presume that confidential information was shared "based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services"). However, "the inquiry into the issues involved in the prior representation should be as specific as possible, so as to avoid undue impairment of the subsequent client's interest in selection of counsel of choice . . . ." Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3e. Any presumption as to what information was shared may be rebutted "by proof concerning the information actually received in the prior representation." Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3.

The materials submitted by the parties on the record and *in camera* document that confidential information was provided by Colonial to Shechter and Mizell. That information includes the 1992 legal opinion letter regarding Colonial's possible defenses to a relocation demand; two internal communications by Colonial's in-house counsel in 2000 regarding Colonial's initial impressions of MNAA's proposal to consolidate the existing easement agreements and its general position as to the requirements of the Easement Agreement relocation clause; and the 2002 request for advice on renegotiating the relocation clause in the future.

The Court also may presume that other related confidential information was communicated to Shechter and Mizell in the course of their meetings with Colonial. *See* Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3e. But the Court need not do so in these actions. The ultimate question in the Court's Rule 1.10(b) analysis is whether any lawyer remaining at Waller has confidential information that is material to the relocation action. The only current Waller lawyers alleged to have any confidential information from Colonial are Davidson and Waller's General Counsel. The only confidential information those lawyers have is that contained in the documents they reviewed as

part of this conflicts inquiry.[8] Those documents therefore constitute the universe of confidential information at issue in these motions.

Regardless, neither the information contained in the documents nor the "general type of information that [Shechter and Mizell] would have been exposed to in a normal or typical representation of the type that occurred with [Colonial]" is relevant to or would materially advance MNAA's position regarding the claims and counterclaims in the line strike action. *Bowers*, 733 F.3d at 652. The relevant events in the line strike action all took place years after Colonial's last contacts with Waller. Shechter and Mizell did not advise Colonial regarding the terms of the Easement Agreement that are relevant to damage of the pipeline or raised in the parties' claims and counterclaims; indeed, it is difficult to imagine what information Colonial might have disclosed to Shechter and Mizell regarding a proposed renegotiation of the relocation clause that could be material to those claims. The line strike action is not substantially related to Shechter and Mizell's prior representation of Colonial. Because a substantial relationship between the former and current matters is required for a formerly associated lawyer's conflict to be imputed to current counsel, the Court need go no further in its analysis. Waller is not prohibited from representing MNAA in the line strike action.

### 2. The Relocation Action

Whether the relocation action is substantially related to Shechter and Mizell's representation of Colonial is a closer question. MNAA's claims in the relocation action begin with negotiations between MNAA and TDOT in 2018 to realign a highway and improve terminal access roadways to allow for expansion of the airport. (R. 809, Doc. No. 1-1.) MNAA notified Colonial

---

[8] Davidson and the General Counsel did not review the 2002 email from Morrison to Shechter.

17
Case 3:20-cv-00666 Document 96 Filed 07/27/21 Page 17 of 20 PageID #: 809

that, because its pipeline interfered with the terminal access roadway relocations, Colonial would have to relocate it, and the parties "met to address engineering issues related to relocation of Colonial's pipeline to accommodate the Airport's expansion plans" in 2018 and 2019. (*Id.* at PageID# 11, ¶ 11.) In December 2019, Colonial notified TDOT that it considered TDOT one-hundred-percent responsible for funding the relocation. (R. 809, Doc. No. 1-1.) TDOT rejected Colonial's position, and negotiations among Colonial, MNAA, and TDOT continued through 2020 until MNAA filed the relocation action. (*Id.*)

MNAA seeks a declaratory judgment that the Easement Agreement requires Colonial to relocate the pipeline at its sole expense because it interferes with the airport expansion. (*Id.*) MNAA also claims that Colonial's refusal to relocate the pipeline is a breach of contract. (*Id.*) Colonial counterclaims that the acts and omissions it ascribes to MNAA in the line strike action are the first material breach of the Easement Agreement and relieve Colonial of any obligations under its terms. (R. 809, Doc. No. 8.) Colonial also asserts that the Easement Agreement does not apply to portions of the pipeline that have been relocated to areas outside of the easement's borders, including some at issue in this case. (*Id.*)

The relocation action and Waller's prior representation of Colonial do not involve the same legal dispute. The relocation action addresses MNAA's 2018 demand that Colonial relocate a portion of the pipeline because of current airport expansion plans and Colonial's claim that it is no longer obligated to do so because of the 2019 line strike and earlier pipeline relocations. Those particular circumstances could not have been known or anticipated at the time Shechter and Mizell represented Colonial. However, the past and present matters do share a common question of Colonial's obligations under the Easement Agreement's relocation clause. Again, the documents reviewed *in camera* show that Colonial provided confidential information to Shechter and Mizell

regarding that common question and the Court may presume that Colonial communicated other related confidential information. Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3e. The Court must therefore determine whether any of that known or presumed confidential information would materially advance MNAA's position in the relocation action. Tenn. Sup. Ct. R. 8, RPC 1.9 cmt. 3.

The confidential information in the documents would not. The 1992 legal opinion letter addresses several general defenses that Colonial could raise to a relocation demand, but none of those defenses is raised by Colonial in the relocation action and none addresses the issues raised by MNAA's claims. The two internal communications from 2000 state Colonial's general position as to its obligations under the relocation clause. That general position is apparent from Colonial's filings and its historical articulation in these documents provides nothing that would materially advance MNAA's position now. The information contained in these documents thus does not establish a substantial relationship between the past representation and the relocation action.

And, again, the Court need only consider those three documents in assessing the potential conflict. The documents do not contain confidential information that is substantially related or material to to the relocation action. Any conflict Shechter and Mizell might have in the relocation action cannot be imputed to any current Waller attorney. Waller is not prohibited from representing MNAA in the relocation action.

### III. Conclusion

Motions to disqualify counsel require a court to balance "upholding the highest ethical standards of the profession, protecting the interest of the litigants in being represented by the attorney of their choosing, protecting the loyalty and confidence a prior client may have placed in law firm or an attorney, and the overriding societal interests in the integrity of the judicial process." *Cavender v. U.S. Xpress Enterprises, Inc.*, 191 F. Supp. 2d 962, 965 (E.D. Tenn. 2002). Having considered all of the evidence submitted *in camera* and on the record, the Court is convinced that

19
Case 3:20-cv-00666   Document 96   Filed 07/27/21   Page 19 of 20 PageID #: 811

allowing MNAA's counsel to continue its representation does not compromise any of these weighty interests. The "drastic measure" of disqualification need not be employed in these actions. *In re Valley-Vulcan Mold Co.*, 237 B.R. at 337.

Colonial's motions to disqualify MNAA's counsel (R 666, Doc. No. 70; R. 809, Doc. No. 46) are therefore DENIED.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge